ISQUICK, Appellant,

v.

CLASSIC AUTOWORKS, INC. et al., Appellees.

[Cite as *Isquick v. Classic Autoworks, Inc.* (1993), 89 Ohio App.3d 767.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 63120.

Decided Aug. 9, 1993.

768

Paul M. Kaufman, for appellant.

Petersen, Ibold & Wantz and Robert R. Wantz, for appellees.

KRUPANSKY, Judge.

Plaintiff-appellant B. Scott Isquick appeals from an order of the trial court granting defendants-appellees Ronald Fuller and Classic Autoworks, Inc. a new trial. The trial court determined a new trial was warranted since substantial justice had not been done in connection with the parties' dispute involving the restoration of antique automobiles.

Plaintiff filed a three-count complaint in the trial court May 5, 1988 against defendants Fuller, individually and doing business as Classic Auto Works, and

defendant Classic Autoworks, Inc. Plaintiff's complaint raised the following three claims, *viz.*: (1) breach of contract to serve as a "project manager" to restore antique automobiles owned by plaintiff, (2) fraud by misrepresenting his experience and skill in restoring antique automobiles to induce plaintiff to retain defendants, and (3) negligent failure to conform to the standards of the antique automobile restoration industry. Defendants filed an answer denying the allegations in plaintiff's complaint and raised a counterclaim for unpaid wheel covers on account in the amount of $884.18.

The matter proceeded to a jury trial on plaintiff's contract and negligence claims along with defendants' counterclaim. Plaintiff presented testimony from the following four witnesses, *viz.*: (1) plaintiff Isquick; (2) defendant Fuller, as if on cross-examination; (3) Jerome Miscevich, the third person engaged by plaintiff to restore his antique automobiles; and (4) Dale Adams, the fourth person plaintiff engaged to restore the same antique automobiles. Defendants presented testimony from the following three witnesses, *viz.*: (1) John Peets, a high school student employed by defendants to restore the vehicles; (2) defendant Fuller; and (3) his wife Kathleen Fuller.

The testimony adduced at trial demonstrates plaintiff was a successful businessman who owned a collection of rare antique automobiles. Several of plaintiff's automobiles were destroyed or seriously damaged by a fire at his Pepper Pike home in March 1976. Plaintiff subsequently engaged a series of four different persons to restore the vehicles he deemed to be salvageable, including the three vehicles in the case *sub judice*, to wit: (1) a 1911 Mercedes seventy horsepower, (2) a 1911 Mercedes fifty horsepower, and (3) a 1925 Mercedes. One plaintiff witness testified the 1911 Mercedes seventy horsepower was the only existing vehicle of its type in the world and had an estimated value of $1 million.

Isquick initially hired Jack Fisher to restore these vehicles sometime after the fire. Defendant Fuller, who worked full-time as an industrial arts teacher at Newbury High School in Geauga County during this time, was hired by Fisher to help in the restoration on a part-time basis. Fuller had no prior experience restoring antique cars, a fact known to Isquick, although Fuller had experience doing body work on modern vehicles predominantly Chevrolet Corvettes. Isquick and Fuller became acquainted with each other and subsequently discussed the possibility in 1984 of Fuller working full-time on the vehicles because Isquick was dissatisfied with the progress of the restoration since the fire eight years previously.

Fuller began working on the three antique vehicles on a time and material basis and submitted periodic billings to Isquick over a three-year period from October 1984 through approximately March 1987. Fuller was initially paid between six and eight dollars per hour. Fuller subsequently incorporated

defendant Classic Autoworks, Inc. during 1986. Isquick monitored the progress of the restoration project from time to time and paid all invoices submitted to him without objection. The total amount of the invoices submitted by Fuller for the restoration of these three automobiles during this period was $41,541.74.

Isquick ultimately contacted a third person, Jerome Miscevich, concerning the restoration project, who stated he could do a better job restoring the vehicles than defendants. Isquick hired Miscevich at thirty dollars per hour and ultimately transported the three vehicles during 1987 to Oakfield Restoration, the restoration shop owned by Miscevich. Isquick filed the case *sub judice* against defendants after defendants sent him an unpaid invoice in the amount of $884.18 for wheel covers which formed the basis for defendants' counterclaim.

Miscevich testified that he subsequently had to undo and correct all the work performed by defendants during the following year and one half at a cost to Isquick of $54,258.59. Miscevich, like defendants before him, used a non-metallic substance commonly known as "Bondo" to smooth the metal surface of the vehicles during restoration. Isquick finally contacted a nationally known antique automobile restoration expert, Dale Adams of Dale Adams Enterprises, to restore the vehicles. Adams testified by videotaped deposition that he either replaced the charred metal body or smoothed and restored the original body of vehicles through various metalworking techniques rather than using non-metallic fillers. Isquick testified he learned about this process in early 1987 approximately three years after Fuller had begun the restoration. His testimony follows:

"I didn't realize at the time the procedure that should have been followed is what they call metalworking. That you can shrink metals and stretch metals so that you can get them straight without the need of putting in foreign materials."

Adams also testified he likewise had to redo most of the work performed by Miscevich, since Miscevich also used non-metallic fillers to complete the restoration.

Plaintiff withdrew his negligence claim at the close of the evidence and the matter was submitted to the jury on his breach of contract claim. The jury subsequently returned a general verdict, seven to one, in favor of plaintiff in the amount of $67,786.86. The trial court's journal entry concluded the amount of the verdict equals the total amount paid to defendants plus half the amount paid to Miscevich less the unpaid invoice for the wheel covers. Defendants thereafter filed on October 8, 1991 a timely motion for judgment notwithstanding the verdict or in the alternative for a new trial. The trial court subsequently granted defendants' motion for a new trial in a sixteen-page journal entry and opinion journalized January 13, 1992. Plaintiff timely appeals raising the following sole assignment of error:

"The trial court erred in granting a new trial to the defendants."

Plaintiff's sole assignment of error lacks merit.

Plaintiff contends the trial court abused its discretion by granting defendants a new trial since the jury verdict was not contrary to law or against the manifest weight of the evidence.

The trial court concluded it had erroneously submitted the case to the jury on plaintiff's breach of contract claim since the evidence adduced at trial demonstrated the agreement between plaintiff and defendants concerning the restoration of the vehicles was not sufficiently definite to constitute an enforceable contract. The trial court noted the two-page typewritten "Notes" submitted by Fuller to Isquick concerning the restoration project upon which this claim was based contained absolutely no provision concerning the extent or scope of the restoration or methods to be followed to restore the vehicles. Plaintiff recognized during his own testimony that his relationship with defendants was casual and had not ripened into a "formal contract" in the following colloquy:

"DEFENSE COUNSEL: Well it would be my impression if somebody had a contract to perform work there would be a contract to do it for a certain sum or there would be a contract to do it at some sort of an hourly rate. Wouldn't there have been some sort of agreement, payment?

"A. I don't believe so. This was a casual relationship. This was a young man that I met and liked very much and encouraged. He went on trips with me as you pointed out in your statement and I took a couple of his employees with me to see what restored cars should look like. And there was no formal contract.

"Q. You are saying that you had no contract with this man to do your work?

"A. There was no contract.

"Q. No formal contract?

"A. We had a verbal understanding. Like I was going to meet you tonight for dinner, and we would both agree on that.

" * * *

"Q. Did you know that he never restored a vintage car in his life?

"A. Yes, I knew that. Although he had restored vintage Chevrolet Corvettes he told me."

Obviously from the above testimony of the plaintiff, there was no meeting of the minds. Additional testimony adduced at trial from the three witnesses who worked on the vehicles indicated antique automobile restorers performed specialized services and there was no established custom or practice in the restoration business since the standards used were dependent on the cost, what the owner

wanted to pay for the restoration, the expertise of the particular person retained and the relationship of the owner and person retained.

█ Of particular significance is the following testimony of Dale Adams, who explained he would not enter into a contract to completely restore a vehicle:

"DEFENSE COUNSEL: For example, if Mr. Isquick with this car came to you and said I want this car fully restored—

"A. Um-hum.

"Q. —and I want to spend $50,000, where would you tell him to go?

"A. Well, I would tell him to go someplace that charges $50,000 for restorations."

Plaintiff has failed to demonstrate the trial court erred as a matter of law in granting defendants a new trial on this ground. It is well established that contracts are not enforceable when the terms are not sufficiently definitive. Compare *Mr. Mark Corp. v. Rush, Inc.* (1983), 11 Ohio App.3d 167, 11 OBR 259, 464 N.E.2d 586. It is apparent from the testimony of plaintiff that there was no meeting of the minds regarding the terms of a contract. Under the circumstances, based on the absence of specific contractual duties concerning the scope or extent of the restoration and standards to be used while restoring the vehicles, plaintiff's claims were for negligence in performing unworkmanlike repairs or malpractice which sound in tort rather than contract. See *Nolen v. Standard Oil Co.* (1989), 63 Ohio App.3d 746, 580 N.E.2d 49 (claim for negligent automobile repairs); *Robb v. Community Mut. Ins. Co.* (1989), 63 Ohio App.3d 803, 580 N.E.2d 451 (medical malpractice).

The trial court's journal entry opinion granting a new trial summarized the proceedings at the close of plaintiff's case stating as follows:

"COURT: What you are really saying, he breached the contract because of his negligence. Isn't that what you are saying?

"PLAINTIFF'S COUNSEL: Yes. They overlapped to that extent, I think.

"COURT: What is your position with respect to the Court charging on comparative negligence if he charges on negligence?

"PLAINTIFF'S COUNSEL: Well, I don't believe that there has been any evidence to establish there was any comparative negligence.

"COURT: We haven't heard the defense yet.

"PLAINTIFF'S COUNSEL: That is true. The motion could be renewed or re-examined at the end of defendants' case.

"COURT: I am just asking you. I foresee the problems, and I want you to foresee the problems. The evidence so far is the relationship continued for three years, between these two gentlemen, with your client checking weekly.

"PLAINTIFF'S COUNSEL: No, the evidence wasn't that he checked weekly with Mr. Fuller. It was weekly with Mr. Miscevich. With Mr. Fuller it was sometimes once a month.

"COURT: But he was kept aware of what was going on?

"PLAINTIFF'S COUNSEL: Generally, but he has no expertise or training or background with respect to restoration of the vehicles. He is used to dealing with finished vehicles that he takes and shows. He does have some—

"COURT: I don't want to argue the merits. I just wondered what your reaction was to the likelihood that your opponent is going to ask me to charge on comparative negligence.

"PLAINTIFF'S COUNSEL: Then I would withdraw the negligence claim.

"(The court then overruled the Rule 50[A] motion for dismissal)

"It is apparent that several errors were made by the court during the above discussion. As set forth below, the evidence clearly fails to support the existence of any kind of contract or even an informal understanding that had been breached. Defendants' Rule 50(A) Motion to Dismiss count one [for breach of contract] should have been granted, and plaintiff should have proceeded under count three, based on alleged negligent repair and poor workmanship. Instead, the court advised counsel of the distinct possibility that it would charge on comparative negligence, in view of Isquick's involvement in the entire restoration process, and counsel then elected to withdraw the count in negligence. This was done in spite of the fact that Isquick's main evidence in support of his claim for poor workmanship was so-called expert testimony from other auto restorers who said that Fuller's work was below the standard of care—clearly raising a question of negligence.

"While the court was attempting to clarify issues and simplify the trial, his unsolicited comments concerning the comparative negligence permitted plaintiff's alert counsel to avoid giving the jury the opportunity to consider Isquick's fault, if any, in the entire matter. This interference by the court, and his failure to grant the Rule 50(A) motion on Count One constituted a major blow to Fuller's defense, and in itself justifies a new trial." (Trial Court's Journal Entry and Opinion at 5–7.)

The trial court's remarks to plaintiff's counsel resulting in the withdrawal of plaintiff's negligence claim also prevented the jury from considering the compara-

tive negligence, if any, resulting from plaintiff's oversight and direction of defendants' restoration.

Plaintiff has likewise failed to demonstrate the trial court abused its discretion in granting defendants a new trial on the grounds the verdict was not sustained by the evidence. It is well established that a trial court's decision to grant a new trial on the grounds the verdict is not sustained by the evidence lies within its sound discretion and will not be reversed absent an abuse of that discretion. *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, syllabus paragraph one; *Krejci v. Halak* (1986), 34 Ohio App.3d 1, 516 N.E.2d 235. The Ohio Supreme Court has defined "abuse of discretion" as involving " 'more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142; *Krejci v. Halak, supra*, 34 Ohio App.3d at 3, 516 N.E.2d at 237–238. When reviewing a trial court's exercise of discretion to grant a new trial in this context, a reviewing court is required to view the "evidence favorably to the trial court's action rather than to the original jury's verdict." *Rohde v. Farmer, supra*, 23 Ohio St.2d at 94, 52 O.O.2d at 382, 262 N.E.2d at 692.

The trial court concluded from the testimony and photographs of the restoration produced at trial that defendants did provide services of value to Isquick over a three-year period and Isquick's claims otherwise were not supported by the evidence. The record demonstrates that defendants disassembled, cleaned and reassembled the vehicles in addition to the challenged vehicle body restoration services. Moreover, as noted by the trial court, Jerry Miscevich, the third automobile restorer retained by plaintiff likewise used the same non-metallic filler method to smooth metal surfaces of the vehicles; therefore, the award of half of this cost to Isquick apparently resulted from an improper compromise verdict. The record contains evidence Isquick changed his expectations concerning the quality of the restoration well after the restoration had already begun. His early concern over the cost cutting of the restoration manifested his desire for less than a state of the art restoration.

The trial court's journal entry opinion analyzing the weight of the evidence stated as follows:

"Regardless of the theory by plaintiff for recovery, even if he had pursued the claim of negligence in Count Three, the weight of the evidence in this case does not support a substantial verdict, or possibly any verdict at all, for plaintiff." (Trial Court's Journal Entry and Opinion at 12.)

The trial court's journal entry indicates the trial court probably would have granted judgment notwithstanding the verdict had it not erred by refusing to

grant defendants a directed verdict on the breach of contract claim. The trial court further advised plaintiff's counsel there was a "distinct possibility" the court "would charge on comparative negligence, in view of Isquick's involvement in the entire restoration process, and [plaintiff's] counsel then elected to withdraw the count in negligence." (Trial Court's Journal Entry and Opinion at 6.) The trial court concluded, "in the interest of justice" the better approach under the circumstances was to grant a new trial in order to be fair to both parties. (Trial Court's Journal Entry and Opinion at 1.)

Based upon the foregoing analysis, the trial court did not abuse its discretion or err by granting defendants' motion for a new trial.

Accordingly, plaintiff's sole assignment of error is overruled.

*Judgment affirmed.*

JOHN F. CORRIGAN, P.J., and STILLMAN, J., concur.

SAUL G. STILLMAN, J., retired, of the Eighth Appellate District, sitting by assignment.