**NOT RECOMMENDED FOR PUBLICATION**

File Name: 05a0687n.06

Filed: August 9, 2005

No. 04-3886

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

ROBERT A. GOODMAN )
)
    **Plaintiff-Appellant,** )
)
v. )    **ON APPEAL** FROM THE
)    UNITED STATES DISTRICT
CISCO SYSTEMS, INC., )    COURT FOR THE NORTHERN
)    DISTRICT OF OHIO
    **Defendant-Appellee.** )
)
)
)
_____ )

**Before: MARTIN and ROGERS, Circuit Judges; and FORESTER,[*] District Judge.**

    **KARL FORESTER, Senior District Judge.** Robert Goodman appeals the district court's grant of summary judgment to defendant Cisco Systems, Inc. ("Cisco") on claims arising from a "success fee" allegedly owed to Goodman for his involvement in certain corporate transactions.

## FACTUAL AND PROCEDURAL BACKGROUND

---

[*] The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

In 1986, Goodman started the law firm of Goodman, Weiss, and Miller ("GWM"), where he served as a partner until December of 1999, when he took of-counsel status. During his active practice with GWM, Goodman represented Aironet Wireless Communications ("Aironet"), a company that was later acquired by Cisco. In July 1999, Aironet engaged in an initial public offering ("IPO"), in which GWM represented Aironet. GWM billed Aironet on an hourly basis for its work on the IPO.

Goodman claims that he was not involved in the day-to-day work on the Aironet IPO in July of 1999, but assisted in getting the IPO "rolling". Subsequently, during the summer of 1999, Aironet's CEO, Roger Murphy, allegedly called Goodman and expressed some concern about the ultimate success of the IPO. After his discussion with Roger Murphy, Goodman claims that he became more involved with the IPO. Specifically, Goodman claims he opened up a dialogue with the SEC, persuaded a third company to sell its shares in Aironet, and intervened to keep people from alienating the SEC. Goodman alleges that Murphy was seeking Goodman's "distinct diplomatic skills [and] his personal connections and influence." Appellant's Br. 7. In addition, Goodman claims that Murphy told him that "if you will get involved [in the IPO], you will get a premium for yourself above your fee." JA 285.

Goodman stated that the first time he and Murphy discussed the amount of the fee was in January of 2000, and that when the IPO closed in July/August of 1999, there was not a firm agreement as to a particular fee. After the IPO was completed, Cisco began negotiations to acquire Aironet. At this time, Goodman claims that Murphy told him about the acquisition and advised that he would like Goodman to be involved personally. Goodman also alleges that Murphy told him that he would receive a premium for his participation. As for his involvement

2

in the merger, Goodman claims that he acted "like an insurance policy against things going wrong," and used his influence to keep a third company from doing anything to harm the merger. JA 346-47.

Goodman admits that he and Murphy did not discuss the amount of the premium at the time Murphy asked him to get involved in the merger, but instead, Murphy told him in late January or early February 2000, to name his figure, well after the merger agreement was signed on November 8, 1999, but prior to the completion of the merger on March 15, 2000. Goodman expressed some reluctance to name a figure and Murphy told him to find some benchmarks to give guidance on setting the amount of the premium. In mid-February, Goodman told Murphy that some people were using bankers' fees for non-bankers and Murphy allegedly responded that he would give Goodman sixty (60) basis points of the value of the merger. Sixty (60) basis points would equal $7.2 million. Goodman, however, allegedly suggested cutting the fee in half because he was uncomfortable with the proposed $7.2 million.

Subsequent to their agreement, Goodman told Murphy that he would be willing to allocate $1 million of the $3.6 million merger fee for the work he completed on the IPO. Therefore, Goodman claims that the $3.6 million fee sought was compensation for his work on both the merger and the IPO. In order to collect his fee, Goodman sent a single line-item invoice for $3.6 million to Aironet on March 8, 2000. The invoice was sent on GWM letterhead and asked that Aironet transfer the funds to Goodman's personal account. This was the first reference to the alleged IPO or merger fees in writing. Murphy denies ever having agreed to pay Goodman any fees beyond those paid to GWM for its representation of Aironet in the IPO and the merger.

3

In March of 2000, Cisco assumed all debts and liabilities of Aironet after the completion of the merger. This included any fee owed to Goodman for services rendered. Prior to the closing of the merger, Cisco received documents from Aironet listing the $3.6 million as a liability. However, Cisco became suspicious of the $3.6 million fee and began investigating the legitimacy of the invoice in April or May of 2000. On May 3, 2000, Cisco financial manager, Mike Tamaru, sent an email to Jane Isham, Aironet's former, and Cisco's current, corporate controller. In this email, Tamaru requested more detail relating to the Goodman invoice. Isham forwarded Tamaru's email to Murphy, who responded with the following email on May 4, 2000:

> The Goodman Weiss Miller (GWM) invoice represents: 1) a fixed fee of $2.4M for the Cisco/Aironet acquisition and 2) a 1.2M fee relating to Aironet's IPO.
>
> The $2.4M acquisition fee is a transaction based fee based on 0.3% of the aggregate transaction value measured at the time the deal was announced (November 8, 1999). The calculation being $800M x .003 = $2.4M. This transaction fee is in addition to hourly billings that total approximately $200K (per Jane Isham).
>
> As a point of reference, Aironet's investment banker, Dain Rausher Wessels, received a transaction fee of 0.6% of the aggregate transaction value measured at the time of closing (March 15, 2000). The calculation being $1,275M x .006 = $7.64M. Besides the difference in measurement dates, the DRW fee was due and payable at closing.
>
> In terms of reasonableness, the combined DRW and GWM fees total .8% of the transaction value at closing which I believe is reasonable and fair in M&A type deals that can range from 0.5 to 2.0 percentage points.
>
> The $1.2M fee relating to the Aironet IPO is a different story. This is both belated and disputed amount between the Company and GWM, I believe, based on recent conversations with the managing partner, that the GWM firm is willing to waive any claim to the $1.2M fee in exchange for receiving prompt payment of the $2.4M acquisition fee.
>
> I hope this answers your questions. Let me know if I can be of further assistance, as I would like to conclude this matter before I leave Cisco on May 31st.

4

JA 1312. Subsequently, Tamaru sent various emails to Cisco employees asking for invoice details and any other documentation relating to Goodman's bill. In an email to Isham dated July 28, 2000, Tamaru indicated that the invoice should not be paid.

On January 30, 2000, Goodman filed suit seeking payment of the fee. In his complaint, Goodman alleged: 1) breach of contract; 2) unjust enrichment; and 3) promissory estoppel. The district court granted Cisco's motion for summary judgment on all claims, finding that there was no binding contract between the parties because, as Aironet's outside counsel, Goodman had an ethical duty to undertake any action necessary to achieve the goals of Aironet. Therefore, the district court reasoned, there was no consideration for the promise to pay Goodman an additional amount for his personal involvement in the transactions. Furthermore, the district court found that there was no enforceable contract between the parties because the terms of the contract were indefinite and because no meeting of the minds had occurred. The district court found that Cisco had not been unjustly enriched by Goodman's involvement in the IPO and the merger because "Goodman did not confer an uncompensated benefit on Cisco." JA 57. Finally, the court found that Goodman could not prove that he detrimentally relied on the purported promise to pay him a premium in exchange for his services.

Goodman appeals the district court's grant of summary judgment.

## ANALYSIS

### I.    Standard

The district court's grant of summary judgment is reviewed *de novo*. Valentine-Johnson v. Roche, 386 F.3d 800, 807 (6th Cir. 2004). "Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

5

In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party." Id.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  Because this is a diversity action, the Court must apply the substantive law of Ohio.  See, John Hancock Fin. Servs. v. Old Kent Bank, 346 F.3d 727, 733 (6th Cir. 2003).

## II.     Breach of Contract Claim

In his complaint, Goodman alleges that he entered into a contract with Murphy for the payment of a fee upon the successful completion of Aironet's IPO and merger with Cisco.  The district court found that Goodman and Aironet had no valid contract because there was a lack of consideration for the alleged fee, there was no mutual assent to the contract terms, and the contract was indefinite.

Under Ohio law, a plaintiff alleging breach of contract must demonstrate 1) the existence of a contract; 2) performance by the plaintiff; 3) breach by the defendant; and 4) damages. Doner v. Snapp, 649 N.E.2d 42, 44 (Ohio App. 1994).  To establish a valid contract, the conduct of the parties must evidence a meeting of the minds, and the essential terms of the contract must be definite and certain.  Nilavar v. Osborn, 711 N.E.2d 726, 732 (Ohio App. 1998).  The terms of the contract are generally considered certain when they provide a basis for determining the existence of a breach and determining an appropriate remedy.  Id. at 734.

Goodman is unable to prove either a meeting of the minds or certainty as to the essential terms of the alleged success fee for the IPO.  It is unclear what specific actions were required beyond Goodman's involvement through GWM in the IPO.  Goodman and Murphy had no

6

agreement about the fee that would be paid for Goodman's involvement in the transaction. In fact, Goodman repeatedly admitted that there was no binding agreement between him and Murphy at the time the IPO closed. See, JA 286, 287 and 289.

Furthermore, Goodman is unable to prove a meeting of the minds regarding the terms of the alleged contract for the merger success fee. In a similar action, Isquick v. Classic Autoworks, Inc., 627 N.E.2d 624, 627 (Ohio App. 1993), the court found that an alleged oral agreement concerning the restoration of antique vehicles was not sufficiently definite to constitute an enforceable contract because the agreement contained no provision concerning the extent or scope of the restoration or methods to be followed in restoring the vehicles. Similar to Isquick, the agreement between Goodman and Murphy contained no provisions concerning the extent or scope of Goodman's involvement in the transactions.

## III.    Unjust Enrichment Claim

Goodman argues that, whether or not the court finds the success fee agreements constituted enforceable contracts, he should be allowed to recover under a theory of unjust enrichment.

The doctrine of unjust enrichment is a quasi-contractual theory of recovery which provides that "a person shall not be allowed to profit or enrich himself inequitably at another's expense, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made." Norton v. City of Galion, 573 N.E.2d 1208, 1209 (Ohio App. 1989). Therefore, in order to successfully state a claim of unjust enrichment, a plaintiff must establish "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit

7

by the defendant under circumstances where it would be unjust to do so without payment."

Hambleton v. R.G. Barry Corp., 465 N.E.2d 1298, 1302 (Ohio 1984).

Goodman cannot establish all of the elements needed to support a claim of unjust enrichment. First, he cannot demonstrate that he conferred a benefit. Goodman fails to demonstrate how his role facilitated the success of the IPO or merger transaction. Second, it appears that Cisco was unaware of any agreement between Cisco and Aironet. Furthermore, it does not appear that Murphy or anyone else at Aironet knew exactly what Goodman was doing to facilitate the IPO and/or the merger. Therefore, there was no apparent knowledge by the defendant of the benefit conferred by Goodman. Finally, Goodman has failed to demonstrate that the retention of any benefit conferred would be unjust. As outside counsel for Aironet, Goodman was expected to work for the benefit of his client. In addition, Goodman testified that he billed and was paid for some of the services that he performed in relation to the IPO and the merger. Therefore, it would not be unjust for Cisco to retain any benefit received from Goodman's involvement.

## IV.     Promissory Estoppel Claim

Goodman's promissory estoppel claim is also meritless. Promissory estoppel is a quasi-contractual remedy employed by courts to prevent an injustice. In order to succeed on a theory of promissory estoppel, a plaintiff must establish 1) a promise; 2) that is clear and unambiguous in its terms; 3) reliance by the party to whom the promise is made; 4) that the reliance was reasonable and foreseeable; and 5) that the party claiming estoppel was injured by the reliance. Rigby v. Fallsway Equip. Co., Inc., 779 N.E.2d 1056, 1061 (Ohio App. 2002).

8

Assuming Murphy promised to pay Goodman a fee for his involvement in the IPO and merger, the terms of such a promise were not clear and unambiguous. At the time any promise was made, it was not clear what type of involvement was required by Goodman or what amount of compensation would be rendered. In fact, Goodman testified that he did not come to an agreement with Murphy relating to the fee until February 2000, well after the close of the IPO and after he became involved in the merger. Therefore, at the time Goodman alleges he detrimentally relied on Murphy's promise by becoming involved in the IPO and merger, the terms of the promise were not clear and unambiguous. In addition, Goodman cannot prove that he was injured by any reliance on Murphy's promise. As addressed above, Goodman testified that he billed and was paid for some of the time he devoted to the IPO and merger. Therefore, if Goodman had billed for all of the time he devoted to the transactions, it can be assumed that he would have been properly paid.

## CONCLUSION

Goodman is unable to prove that a valid contract existed for the payment of any success fees for his involvement in Aironet's IPO and merger with Cisco. Furthermore, Goodman has not shown that Cisco was unjustly enriched by Goodman's involvement in the transactions. Finally, the requirements of promissory estoppel have not been met in this action.

For the foregoing reasons, we AFFIRM the judgment of the district court.

9