**NILAVAR, Appellant,**

v.

**OSBORN et al., Appellees.**

[Cite as *Nilavar v. Osborn* (1998), 127 Ohio App.3d 1.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 97–CA–95.

Decided March 27, 1998.

2

**6**

David M. Rickert and Christine M. McCoy, for appellant.

J. Kevin Cogan and Ivan C. Smith, for appellees.

---

BROGAN, Judge.

Appellant, Sundar V. Nilavar, M.D., appeals from a decision of the Clark County Common Pleas Court granting summary judgment in favor of appellees, Robin E. Osborn, D.O., and Diagnostic Imaging Associates ("DIA"). Appellant claimed damages for breach of contract, promissory estoppel, breach of fiduciary duty, and fraud in connection with the negotiation of a business agreement on appellant's behalf. The trial court found that there was no contract formed between the parties and that Nilavar did not reasonably rely on Osborn to act on his behalf. It further found that Nilavar's claims for breach of fiduciary duty and fraudulent misrepresentation were unsupported by evidence in the record. Granting summary judgment on all claims against Osborn, the court then granted summary judgment on the claim of vicarious liability against DIA.

Reviewing these questions *de novo*, we find that Nilavar provided sufficient evidence on each of his claims against Doctor Osborn to survive summary judgment. However, we hold that DIA cannot be held vicariously liable for actions taken before its incorporation. Accordingly, we reverse the judgment of the trial court in part, affirm in part, and remand the cause to the trial court for further proceedings.

I

## A. BACKGROUND

In 1976, appellant, Doctor Sundar V. Nilavar, became an employee of Springfield Radiologists, Inc. ("SRI"), a business providing radiology services in the Springfield Area. SRI shareholders and employees practiced radiology at either Mercy Medical Center and Mercy Memorial Hospital (collectively, "Mercy") or Community Hospital. In 1979, Dr. Nilavar became a shareholder in the corporation. After 1980, Nilavar practiced primarily at Mercy.

In July 1991, appellee, Dr. Robin E. Osborn, began work as an SRI employee. Osborn subsequently became head of the radiology department at Mercy. In 1993, Osborn became an SRI shareholder.

Before 1991, SRI radiologists had practiced at Mercy without a contract. In January 1991, the two parties began contractual negotiations with the end of making SRI the exclusive radiology services provider for Mercy. Sometime after Dr. Osborn became a shareholder in SRI, the shareholders chose him and Dr. Stanley Nedelman to conduct the negotiations with Mercy. In 1994, the parties reached a tentative agreement. SRI shareholders proposed amendments to the agreements, however, which Mercy rejected. As a consequence, negotiations broke down. One issue that the parties were unable to resolve was whether the radiologists would use ionic or non-ionic contrast media. The use of ionic material, demanded by Mercy, was cheaper but raised safety concerns among some of the radiologists. Dr. Nilavar was the most vocal in opposing the use of ionic contrast media.

After negotiations failed, in April 1995, Mercy issued a request for proposals as an open offer to all radiology service providers. Mercy made clear that it wished its chosen service provider to practice exclusively at Mercy. The request set a deadline of June 16, 1995 for all bids.

Around the time that Mercy issued its request, Dr. Osborn began to organize DIA, a corporation in which Osborn was the sole shareholder. Osborn intended that DIA would submit a proposal to Mercy for the radiology services contract. Two other SRI shareholders, Dr. Bruce MacLean and Dr. Jerald Brinley, agreed that they would work for DIA if Mercy accepted the proposal. All three doctors agreed not to disclose their plans to the other SRI shareholders.

## B. SRI MEETING OF MAY 18, 1995

On May 18, 1995, SRI held a special shareholders meeting to respond to the problems created by the breakdown in negotiations with Mercy and Mercy's request for proposals. All shareholders attended. At that time, SRI consisted of

eleven radiologists, six of whom practiced almost exclusively at Mercy and five of whom practiced at Community. Ten of the eleven doctors were shareholders.

The deposition statements of those who attended the meeting offer different versions of what occurred that day. The witnesses' statements do agree that the only formal motion made at the May 18 meeting was the resolution to dissolve SRI. Dr. MacLean initiated the motion, and Dr. Barney A. Willens seconded it. The motion then was adopted unanimously. The accounts differ, however, over what else occurred during the meeting.

Dr. Nilavar and several other witnesses testified that the shareholders agreed that SRI would dissolve and form two groups. The doctors who practiced at Mercy would form a separate group to accommodate Mercy's requirement that its radiology provider serve Mercy exclusively. Those who practiced at Community would, in turn, form their own business group. Nilavar and his witnesses testified that Dr. Osborn was chosen to prepare and forward a proposal to Mercy on behalf of the six Mercy doctors. Osborn assented to this proposal by nodding his head affirmatively. Dr. Stanley H. Nedelman was then selected to lead the Community group and to find attorneys to facilitate the process of division into two separate business entities.

Against this account of the shareholders meeting, Dr. Osborn testified that the plan to split into two groups was never formalized and never went beyond "opinions and hopes." He stated that he did not recall any discussion about him leading negotiations on behalf of the Mercy group and that he never agreed to such a task. Dr. Brinley testified similarly that he did not recall such a discussion. Dr. MacLean testified that he "tuned off [his] hearing aid" during that portion of the meeting.

Corporate minutes, prepared by Dr. Willens, indicate that the plan for splitting SRI into two groups was discussed during the May 18 meeting. The minutes also indicate that Dr. Osborn would lead the Mercy doctors in presenting a proposal to Mercy. Nevertheless, except to the extent that they report no objection to this proposal, the minutes do not show that Dr. Osborn actually accepted the task assigned to him.

An addendum to the minutes, prepared by Dr. Nedelman on October 3, 1995, attempted to clarify what had occurred at the meeting. The addendum states that division into two groups was part of the plan of dissolution approved by the shareholders. It also states that Dr. Osborn was chosen to lead the group that included all six doctors that practiced at Mercy. Witnesses for Dr. Osborn testified that both the original minutes and the addendum were inaccurate and that certain events were fabricated by Drs. Willens and Nedelman.

## C. SUBSEQUENT EVENTS

On May 25, 1995, SRI held another shareholders meeting. Minutes from that meeting indicate that Dr. Osborn said that "he ha[d] contacted an attorney to begin forming one of the two new entities." These minutes were later approved at a July 27 shareholders meeting attended by Dr. Osborn. Dr. Nilavar testified by affidavit that Dr. Osborn said just what the minutes reflect. Conversely, Osborn testified at deposition that he never explained to the other shareholders why he had contacted an attorney and that his purpose in contacting the attorney was, in fact, to set up DIA.

In June 1995, Nilavar asked Osborn about the situation at Mercy. According to Nilavar's testimony, he asked Osborn whether the latter was setting himself up in a "fat-cat situation," to which Osborn responded that everyone would be equal. Nilavar attested that he understood this to mean that all the Mercy doctors would be part of the new group. Nilavar also testified that he asked Osborn directly whether he would be included in the new group. To this inquiry, Osborn stated, again, that everybody would be equal.

Osborn testified, to the contrary, that, during this encounter, Nilavar never asked directly whether he would be included in the new group. Nevertheless, according to Osborn, he told Nilavar that his position at Mercy "was limited" and that he should be looking for a new job.

Sometime in July 1995, Nilavar asked Osborn to let him see the proposal. According to Nilavar, Osborn responded by saying that he would need to check with his attorney and then he never followed through. Osborn testified otherwise, asserting that he refused the request outright.

Again in July, Nilavar asked Osborn about what was happening with the proposal. According to Nilavar, Osborn told him that other doctors in the group were pursuing employment options in other cities. Nilavar then replied that he could not relocate and that he was depending on Osborn's negotiations with Mercy. In response, Osborn told him that if the proposal was rejected they would all be looking for work. In his deposition testimony, Osborn described the July conversation differently, saying that he told Nilavar once again that his position was "limited."

SRI shareholders held another meeting on June 15, one day before the deadline set by Mercy's request for proposals. The terms of Osborn's proposal to Mercy were not discussed at that meeting. Another meeting was held on July 27, 1995. Nilavar did not attend that meeting. Osborn testified that he told the other SRI shareholders at that meeting that he had submitted a proposal to Mercy and that those who he had not contacted were not included in the new group. Other witnesses denied that he made such a statement.

In late August, Mercy accepted the proposal from DIA. Osborn responded by sending a letter to the SRI Board of Directors, including Nilavar, stating that he had submitted a proposal to Mercy, which had been accepted, and that only Drs. MacLean and Brinley would be joining him. SRI dissolved in December and DIA took over providing radiology services to Mercy.

Nilavar filed a five-branch complaint against Osborn and DIA on May 15, 1996. On March 27, 1997, Osborn and DIA jointly moved for summary judgment on all five counts. Nilavar filed a memorandum in opposition on April 30, 1997 and also moved for additional time to conduct further discovery pursuant to Civ.R. 56(F). On July 10, Nilavar filed a supplemental memorandum in opposition, together with exhibits of evidence taken during the extended period of discovery. On July 21, the defendants filed a joint reply memorandum.

On August 13, 1995, the trial court entered a decision granting summary judgment in favor of the defendants on all claims. Nilavar timely appeals from this judgment of the trial court.

## II

In his first assignment of error, Nilavar contends:

"The trial court erred in granting summary judgment to Osborn on Nilavar's claim for breach of contract."

In granting summary judgment against Nilavar on his contact claim, the trial court found that his case rested entirely upon the assertion that Osborn had nodded assent at the May 18, 1995 shareholders meeting. The court held that a mere nod, under the circumstances, could not constitute assent to a contract. Furthermore, the court found that Nilavar could not prevail because he had not shown any consideration to support the alleged contract.

Appellate review of a summary judgment determination is *de novo*. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, 244–245. Thus, the standard applied by appellate courts, like that for trial courts, derives from Civ.R. 56. To qualify for summary judgment, a movant must demonstrate (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47; see, also, Civ.R. 56(C).

The party seeking summary judgment "bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274. Once the moving party has met that burden, the nonmoving party has a reciprocal burden of showing that an issue of material fact does exist. *Id.*

To prove breach of contract, a claimant must show the following elements: "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 600, 649 N.E.2d 42, 44. To further prove the existence of a contract, the plaintiff must show the elements of mutual assent (generally, offer and acceptance) and consideration. *DeKoning v. Flower Mem. Hosp.* (1996), 82 Ohio Misc.2d 20, 28, 676 N.E.2d 614, 619; *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 61 Ohio St.3d 366, 369, 575 N.E.2d 134, 137. The plaintiff must also show that there was a "meeting of the minds" and that the contract was definite as to its essential terms. *Episcopal Retirement Homes*, 61 Ohio St.3d at 369, 575 N.E.2d at 137; *Alligood v. Procter & Gamble Co.* (1991), 72 Ohio App.3d 309, 311, 594 N.E.2d 668, 668–669.

Osborn and DIA contend that any contract between the parties must have been formed at the May 18, 1995 meeting and the evidence of what occurred there does not support Nilavar's claims. They contend that Nilavar failed to show evidence of the following elements: acceptance by Osborn, "meeting of the minds," the specific essential terms of the contract, and consideration. We will, therefore, review the record from below to see whether Nilavar presented evidence to overcome summary judgment on each of these elements.

## A. ACCEPTANCE

On the element of acceptance, Nilavar's evidence showed that Osborn nodded in assent when the shareholders forwarded a proposal that he present an offer on behalf of the Mercy doctors. Osborn denies making such a gesture. Nevertheless, material disputes in testimony are issues of fact precluding summary judgment. Credibility is a question to be resolved by a jury. *Turner v. Turner* (1993), 67 Ohio St.3d 337, 344, 617 N.E.2d 1123, 1129. Thus, for the purposes of summary judgment, we assume the existence of any fact for which appellant has provided evidence, and we construe all inferences in his favor. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202, 216–217.

Appellees adopt the position of the trial court and contend that, even if Osborn did nod his head, that gesture alone is insufficient to constitute acceptance of contractual duties. Nilavar argues, conversely, that a head nod is sufficient of itself. Fortunately, our determination of whether acceptance was expressed in this case need not turn on such a nice question. Even if the trial court was correct in finding that "a monumental undertaking cannot be inferred by a 'nod of the head' "—a question about which we make no finding—we see more evidence of assent in this case than a nod of the head alone.

██ Acceptance of an offer may be expressed by "word, sign, writing, or act." 17 Ohio Jurisprudence 3d (1980) 463, Contracts, Section 30. Even silence and inaction, under the proper circumstances, can constitute acceptance. 17 Ohio Jurisprudence 3d (1980) 465, Contracts, Section 32. In the instant case, evidence showed that Osborn nodded affirmatively at the May 18 meeting when tasked with submitting a proposal on behalf of the Mercy doctors and choosing an attorney to guide the formation of the new business entity. Minutes from the meeting held exactly one week later, on May 25, show that Osborn also told the shareholders directly that he had "already contacted an attorney to begin forming one of the two new entities." "[C]onsistent with the notion that assent is to be judged objectively, the modern law properly construes both acts and words as having the meaning which a reasonable person present would ascribe to them in view of the surrounding circumstances." 1 Williston, Contracts (4 Ed.1990) 244, Section 4:2. Viewing all evidentiary inferences in favor of Nilavar, the circumstances of the latter meeting indicate that Osborn verbally agreed to assume the duties discussed the week before. Taking all of the evidence into consideration—Osborn's nodding, his failure to state his real intentions, and his statement of May 25—we cannot doubt that Nilavar presented sufficient evidence to raise an issue of fact regarding whether Osborn assented to a contract, if Nilavar can show the remaining elements of contract formation.

## B. MEETING OF THE MINDS

█ Appellees also contend that there was no "meeting of the minds" in this case. As a layperson would understand the meaning of the phrase, there was clearly no meeting of the minds between these parties. Indeed, Nilavar does not suggest that Osborn ever really intended to act in concert with the other Mercy doctors in SRI after May 18. Nevertheless, under contract law, courts properly consider only objective manifestations of intent. Thus, expressions of assent are generally sufficient to show a meeting of the minds. See *Ford v. Tandy Transp., Inc.* (1993), 86 Ohio App.3d 364, 381, 620 N.E.2d 996, 1006–1007. Secretly held, unexpressed intent is not relevant to whether a contract is formed. Courts may still find a "meeting of the minds" even if one party keeps a secret

present intention to disregard his obligations under a newly formed contract. See 1 Williston, Contracts (4 Ed.1990) 240–241, Section 4:1. Nilavar has shown some evidence that Osborn engaged in just this practice of deception, outwardly manifesting assent without intending performance. Accordingly, Nilavar's evidence of assent is sufficient to survive summary judgment on this element.

## C. CERTAINTY OF ESSENTIAL TERMS

Appellees also contend that the essential terms of the contract were left unspecified. They mention the following issues as among those that the parties never resolved: the form of the new business group, Dr. Nilavar's status in the group, his rate of compensation and other terms of employment, the members of the new group, the duration of the new business relationship, and the scope of Dr. Osborn's authority to bind members in the new contract. Appellees fail to make the distinction, however, between the terms of a contract and its essential terms. In a contract that is not for goods, the essential terms are, generally, the parties to the contract and its subject matter. See 17 Ohio Jurisprudence 3d (1980) 446, Contracts, Section 17. Moreover, the terms of a contract are sufficiently certain if they " 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.' " *Mr. Mark Corp. v. Rush, Inc.* (1983), 11 Ohio App.3d 167, 169, 11 OBR 259, 261, 464 N.E.2d 586, 589–590, quoting Restatement of the Law 2d, Contracts (1981) 92, Section 33.

Viewing the evidence in appellant's favor, as we must, we find that the parties to the contract were specified with sufficient clarity to support a breach-of-contract claim. Nilavar's evidence shows that Osborn agreed to act on behalf of the other SRI shareholders who worked at Mercy. A reasonable person might conclude from this evidence that these doctors and Osborn agreed to act jointly in submitting a proposal to Mercy, binding themselves as parties to a contract.

Opposing this conclusion, appellees have provided evidence that Dr. Davis, an SRI employee who was not a shareholder and did not attend the meeting, did not intend to keep practicing in Springfield. Nevertheless, although Davis might have benefited from the contract, he could not have been a party to the contract because he never assented to any of its terms. His actions, therefore, do not prove indefiniteness of parties as a matter of law. Appellees also put forward evidence that Dr. David L. Lawrence, one of the Mercy radiologists who was a shareholder, was seeking other employment opportunities. That evidence, however, shows only that factual issues touching on this element are disputed. It does not show conclusively that the parties were indefinite at the time of the agreement.

14

█  Appellees present a more difficult question concerning the definiteness of the contract's subject matter. It is said that a party cannot be bound to a contractual obligation unless the character of his obligation is fixed with some certainty. 17 Ohio Jurisprudence 3d (1980) 471–472, Contracts, Section 40. Nevertheless, certainty is a matter of degree. Compare, e.g., Mr. Mark Corp., 11 Ohio App.3d at 169, 11 OBR at 261, 464 N.E.2d at 589–590 (finding a contract where all of the terms of a sale were not specified), with Isquick v. Classic Autoworks, Inc. (1993), 89 Ohio App.3d 767, 772, 627 N.E.2d 624, 627–628 (finding failure to state specific duties in contract was fatal to breach-of-contract claim). As appellees have noted, no agreement specified the characteristics of the proposal that Osborn would submit to Mercy. Consequently, we are confronted with the question of whether an agreement to submit a proposal, of itself, can state a specific enough obligation to create a contract. We find that it can where, as upon the instant facts, the circumstances give some reasonable indication of what that obligation would entail.

Too rigid a legal requirement for definite terms, under similar circumstances, might render unenforceable a multitude of common contracts for agency, partnership, or joint ventures that involve one person acting on behalf of another. The Restatement (Second) of Contracts presents a relevant standard that obviates this danger:

"An offer which appears to be indefinite may be given precision by usage or trade or by course of dealing between the parties. Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement to the contrary. * * * Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract." Comment a to Section 33, at 92, quoted in Mr. Mark, 11 Ohio App.3d at 169, 11 OBR at 261, 464 N.E.2d at 589–590.

Here, the parties had a long course of dealing during which Osborn acted as a negotiator with the Mercy administrators. Moreover, Osborn had both the draft agreement from SRI's earlier negotiations with Mercy and Mercy's request for proposals to indicate the character of the proposal he would submit. Given these indications of what Osborn's obligation would entail, a reasonable person might conclude from this evidence that a contract existed with sufficient certainty as to its subject matter. Such a possibility precludes the grant of summary judgment for lack of certainty.

## D.  CONSIDERATION

Appellees also advance the argument, consistent with the trial court's decision, that there was no evidence of consideration given by Nilavar. Nilavar, in

response, claims that the consideration given was threefold: he voted to dissolve SRI, he refrained from seeking other employment, and 'he did not submit a competing proposal to Mercy. We agree with Nilavar that his evidence of consideration was sufficient to overcome summary judgment.

Consideration may consist either in a detriment to the promisee or a benefit to the promisor. *Ford v. Tandy Transp., Inc.* (1993), 86 Ohio App.3d 364, 384, 620 N.E.2d 996, 1009. The consideration given by each party to a contract need not be·expressed and "may be inferred from the terms and obvious import of the contract." 17 Ohio Jurisprudence 3d (1980) 478, Contracts, Section 46. Once consideration is shown, a court will not generally inquire into the adequacy of the consideration. *Tandy,* 86 Ohio App.3d at 384, 620 N.E.2d at 1009. To comprise consideration, however, a benefit or detriment must be something intended by the parties as such; it cannot be something merely incidental to the contract. 17 Ohio Jurisprudence 3d (1980) 486–487, Contracts, Section 54.

The oral contract that Nilavar claims existed bound the Mercy doctors in a joined effort to continue their employment. The natural inference of consideration given in such a contract is the cooperation of each participant. Each doctor would make his services available as part of the offer to the hospital, each person would be ready if the offer were accepted, and each would refrain from entering a competing bid. Each promisor offered the benefit of his cooperation and refrained from independently pursuing his own ends. Given this arrangement, we find that the element of consideration is easily inferred. Moreover, given this evidence of consideration, we need not consider whether Nilavar's vote to dissolve SRI would constitute consideration for a contract.

The trial court cited *Humphreys v. Bellaire Corp.* (C.A.6, 1992), 966 F.2d 1037, as authority for the proposition that forbearance from looking for a job could not, as a matter of law, constitute consideration for a contract. The logic of that opinion, however, clearly confines itself to circumstances involving employment at will. See *id.* at 1040–1041. The Sixth Circuit's interpretation of Ohio law, in that case, was based on its understanding that·there is "no difference between an employee's continuing his normal work and his forebearing from seeking other employment." *Id.* at 1041. The relationship between the parties in this case was not that of master and servant. *Humphreys,* therefore, is clearly inapposite. Moreover, as already explained, Nilavar offered more than his forbearance from seeking another job. His name could be added to the contract proposal, and he refrained from competing with the presumed joint proposal. Consequently, we find that the trial court erred in failing to acknowledge Nilavar's evidence of consideration.

Having found evidence of consideration, we have recognized a genuine issue of fact with regard to each element that Osborn and DIA challenged on Nilavar's

contract claim. Accordingly, we find error in the trial court's grant of summary judgment in the appellees' favor, and we sustain appellant's first assignment of error.

III

Nilavar raises, as his second assignment of error, the following:

"The trial court erred in granting summary judgment to Osborne on Nilavar's claim for estoppel."

Nilavar asserts a claim of promissory estoppel as a theory of recovery alternative to his contract claim. The trial court rejected his estoppel claim because it found that Nilavar had failed to show evidence of a promise and because it found that reliance on a "head nod" was unjustified under the circumstances.

With its opinion in *Talley v. Teamsters, Chauffeurs, Warehousemen, & Helpers, Local No. 377* (1976), 48 Ohio St.2d 142, 146, 2 O.O.3d 297, 299–300, 357 N.E.2d 44, 47, the Supreme Court of Ohio adopted the doctrine of promissory estoppel as formulated within Section 90 of the Restatement of the Law 2d, Contracts. That section states in part:

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement of the Law 2d, Contracts (1981) 242, Section 90.

To demonstrate promissory estoppel, a claimant must show the following elements: a promise, clear and unambiguous in its terms; reasonable and foreseeable reliance; and injury resulting from the reliance. *Cohen & Co. v. Messina* (1985), 24 Ohio App.3d 22, 26, 24 OBR 44, 48, 492 N.E.2d 867, 871–872.

We have already held that Osborn's promise to submit a proposal on behalf of the Mercy doctors was sufficiently certain to support a breach-of-contract claim. We do not doubt, therefore, that such a pledge is sufficiently clear to create a claim for promissory estoppel.

Nevertheless, appellees have cited a number of cases involving employers and employees that have found promises too vague to merit enforcement, in light of the employment-at-will doctrine. For example, in *Faller v. The Christ Hosp.* (Dec. 31, 1996), Hamilton App. No. C–960191, unreported, at 1, 1996 WL 742000, the First Appellate District held that statements about possible promotions in the future could not support an estoppel claim. Similarly, in *Seymour v. ITT Corp.* (June 2, 1988), Crawford App. No. 3–87–4, unreported, at 3–4, 1988 WL 57608,

the Third Appellate District refused to enforce as a promise a vague recollection that the appellant's employers had informed him, twenty-five years earlier, that, if he performed well and the company stayed healthy, he could count on a job. These cases, however, differ greatly from the instant case. Nilavar does not have to overcome the presumption in favor of employment at will because he is not asserting a wrongful-firing claim. Furthermore, the promise he claims to have relied upon was for Osborn to perform a relatively specific act within a relatively short period. Thus, we find it was sufficiently clear in its terms.

The alleged promise, moreover, is not unenforceable because it was a mere "head nod." We have already rejected that characterization of the evidence in this case. Evidence favorable to appellant shows Osborn's assenting to a promise by word, action, and silence. The essence of estoppel is the rule that "one party will not be permitted to deny that which, by his words, his acts, or his silence (when there was an obligation to speak), he has induced a second party reasonably and in good faith to assume and rely upon to that party's prejudice or pecuniary disadvantage." *First Fed. S. & L. Assn. of Toledo v. Perry's Landing, Inc.* (1983), 11 Ohio App.3d 135, 145, 11 OBR 215, 226, 463 N.E.2d 636, 647; *Takacs v. Morgan* (Sept. 30, 1993), Geauga App. No. 93–G–1760, unreported, at 5–6, 1993 WL 408181. Nilavar presented sufficient evidence that Osborn either expected or should have expected that his words and actions would probably induce reliance on the part of his fellow shareholders.

Furthermore, in *Takacs*, the Eleventh Appellate District upheld a promissory-estoppel claim based on, among other things, a nod of the promissor's head. *Takacs, supra*, at 7–9. That court expressly rejected the notion that an enforceable promise could not exist because the promissor "did not expressly state 'I promise.'" *Id.* at 7. Circumstances in that case tended to show a binding promise even without a verbal expression of assent. *Id.* at 9. Nilavar's evidence of the relevant circumstances makes a similar showing. Moreover, to the extent that Nilavar's evidence shows that Osborn made verbal assurances to the shareholders that he had already taken some action, the instant case presents us with less difficulty than the *Takacs* court faced.

With regard to the element of reliance, Nilavar contends that he relied on Osborn in not seeking other employment. Appellees counter that, as a matter of law, refraining from seeking other employment cannot amount to detrimental reliance unless the claimant, depending on the promise, actually rejected employment offers. Appellees cite a number of cases so holding. *E.g., O'Hare v. N. Cent. Local School Dist. Bd. of Edn.* (Sept. 7, 1988), Wayne App. No 2355, unreported, at 4, 1988 WL 93215; *Eagleye v. TRW, Inc.* (Feb. 17, 1994), Cuyahoga App. No. 64662, unreported, at 4, 1994 WL 50671; see, also, *Wing v. Anchor Media, Ltd.* of Texas (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095,

1099. These cases, however, uniformly involve an employee's attempt to overcome the employment-at-will doctrine. There may be special justification for this rule in at-will employment cases; an at-will employee who claims reliance in not looking for other work cannot distinguish himself from one who merely continues working normally. See *Humphreys*, 966 F.2d at 1040–1041. As already noted, however, Nilavar was not Osborn's employee.

■ Nonetheless, we agree with appellees that Nilavar's failure to seek other employment cannot constitute detrimental reliance to support his estoppel claim. Reliance to support an estoppel claim must be "of a sufficiently definite and substantial nature so that injustice will result if the 'promise' is not enforced." *Talley*, 48 Ohio St.2d at 146, 2 O.O.3d at 300, 357 N.E.2d at 47. Without evidence that Nilavar would have found employment, during whatever lapse in time was caused by his reliance, no court could determine what damages, if any, resulted from his reliance. Moreover, by not seeking employment, Nilavar relied on the bid's being accepted, not submitted. Because the bid might have been rejected, such reliance was neither reasonable nor foreseeable.

■ Nilavar makes a more significant claim of reliance based on his failure to submit a bid in competition with DIA's bid. Appellee's contend that this kind of reliance is also too insubstantial to support an estoppel claim. We disagree. Viewing the evidence in Nilavar's favor, he presents a case that Osborn, through a promise, lulled Nilavar and the other Mercy doctors into not proposing a counter bid. Reliance, under those circumstances, was foreseeable and, perhaps, even intended. The reliance, moreover, is directed toward the submission of the proposal, not its acceptance. From such reliance, Osborn and DIA would have enjoyed the benefits of reduced competition as a direct result of a breach of promise. Where a promissor could enjoy such a direct and substantial benefit from the breach of his promise, it would be unjust to conclude that the party in reliance cannot make a claim because it is too indirect or too insubstantial. We conclude, therefore, that forbearing from competition can be reliance "of a sufficiently definite and substantial nature so that injustice will result if the 'promise' is not enforced." *Talley, op. cit.*

Appellees contend, however, that Nilavar was in no position to make a bid for the Mercy contract. They claim that he was unable to find other doctors to practice with him and that his relationship with Mercy was too strained for him to succeed. We agree, in principle, that an inability to actually tender a successful bid makes false any claim of reliance in refraining from doing so. See *Horn & Hardart Co. v. Pillsbury Co.* (S.D.N.Y.1989), 703 F.Supp. 1062, 1070 (interpreting a Section 90 estoppel claim under New York law), affirmed (C.A.2, 1989), 888 F.2d 8. Nevertheless, the claims of Nilavar's inability to tender a successful bid are based on harsh interpretations of the evidence against him. A reasonable

person might conclude otherwise from all the evidence in the record. Thus, we cannot affirm the grant of summary judgment on this basis.

Because we have found that Nilavar presented sufficient evidence on each element of his promissory estoppel claim, we sustain appellant's second assignment of error.

## IV

Appellant's third assignment of error is as follows:

"The trial court erred in granting summary judgment on Nilavar's claim for breach of fiduciary duty."

Nilavar claims that he and Osborn had established a relationship of confidence and trust so that the latter owed him a fiduciary duty, which Osborn breached by usurping the business opportunity offered by Mercy. The trial court rejected this claim, finding no evidence to support it against a summary judgment motion.

Ohio Jurisprudence 3d provides the following explanation of how a fiduciary relationship can arise:

"Ordinarily those relationships that are broadly described by the term 'fiduciary' are those that arise between husband and wife, cotenants, principal and agent, partners, or some like relationship appropriately described by similar terms. But while fiduciary duties arise in those and many other relationships, they do not arise merely because particular names are used to describe the relationship." 49 Ohio Jurisprudence 3d (1984) 48, Fiduciaries, Section 2. Thus, although Nilavar does not identify the exact nature of the relationship between himself and Osborn that would give rise to fiduciary duties, that failure is not necessarily fatal to his claim.

Nilavar asserts that a confidential relationship existed between the parties by virtue of the position as shareholders in a close corporation. We note, in addition, that Osborn was also a director of the corporation and its agent in conducting negotiations with Mercy. These facts may have suggested a breach of fiduciary duty if Osborn had usurped opportunities available to the corporation, SRI. See, *e.g., Frank Lerner & Assoc., Inc. v. Vassy* (1991), 74 Ohio App.3d 537, 545, 599 N.E.2d 734, 738–739. Nevertheless, all parties recognize that SRI could not exploit the opportunity at Mercy under the terms of the Mercy request for proposals. Moreover, after May 18, the shareholders had committed themselves to dissolving the corporation. Thus, we do not see, from the evidence in the record, how Osborn could have breached the duties he owed to Nilavar within the corporate structure. We do recognize, however, that the parties' prior relation-

20

ship may have added an element of confidentiality or trust to a subsequently developed relationship, which may then have given rise to fiduciary obligations.

Indeed, Nilavar's evidence tends to show that a business relationship developed between the parties after the vote to dissolve SRI. Nilavar observes, in this regard, that Ohio recognizes a fiduciary duty owed between business partners, citing *Dunn v. Zimmerman* (1994), 69 Ohio St.3d 304, 631 N.E.2d 1040. We view Nilavar's claims of a business relationship as asserting something akin to partnership, or more specifically, something in the nature of a joint venture. A joint venture is a contractual association in which the parties intend to carry out a common business purpose. *Busler v. D & H Mfg., Inc.* (1992), 81 Ohio App.3d 385, 391, 611 N.E.2d 352, 356. A joint venture differs from a partnership in that it is entered into for a single transaction or a limited period of time. *Id.* Nilavar's claims of a common scheme to submit a proposal to Mercy essentially implicate that this type of business relationship existed.

Although the scope of the duty may be less broad, parties to a joint venture, like those in a partnership, owe each other the duties of fiduciaries. 46 American Jurisprudence 2d (1994) 62, Joint Ventures, Section 33. The fiduciary relationship created by a joint venture imposes a duty of full disclosure between the fellow venturers. *Id.* at 63. It also imposes a duty against self-dealing or secret advantage. See *id.*, Section 36, at 65–66. There is evidence in the record sufficient to support claims that Osborn breached these duties by secretly entering a bid for his own corporation rather than on behalf of the Mercy doctors in SRI. Accordingly we find that Nilavar presented sufficient evidence to survive summary judgment on this claim.

Appellees contend, however, that Osborn could not have assumed fiduciary duties because he never consented to act on behalf of the other doctors. Appellees remark, correctly, that mere reliance on the part of Nilavar could not have imposed a fiduciary duty on Osborn against his will. See *Craggett v. Adell Ins. Agency* (1993), 92 Ohio App.3d 443, 452, 635 N.E.2d 1326, 1332. A fiduciary assumes a duty only when "created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." *Strock v. Pressnell* (1988), 38 Ohio St.3d 207, 216, 527 N.E.2d 1235, 1243. Nevertheless, for reasons that have already been discussed in connection with whether Osborn gave assent to a contract, we find sufficient evidence that Osborn acted in a way to give rise to a fiduciary relationship. We do not think that a secret, unexpressed reservation not to fulfill such duties precludes the duty from being imposed if the fiduciary gave the claimant sufficient cause to rely on his actions. Nilavar has provided sufficient evidence that Osborn expressed an intent to act on his, and others', behalf. Even if that expression was deceiving, evidence of it is sufficient

to overcome summary judgment on this claim. Accordingly, we sustain appellant's third assignment of error.

V

Appellant raises the following as his fourth assignment of error:

"The trial court erred in granting summary judgment to Osborn on Nilavar's claim for fraudulent misrepresentation."

■ The trial court found no evidence of fraud to support Nilavar's claim. We review that determination *de novo*.

■ The elements of a common-law fraud claim are "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Burr v. Stark Cty. Bd. Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus.

Appellees challenge Nilavar's proof on the elements of representation, reliance, falsity, and intention. In finding evidence that Dr. Osborn assented to a contract, we have already recognized sufficient evidence to support a claim that Dr. Osborn made a material representation to Nilavar and the other SRI shareholders. Moreover, in our analysis of Nilavar's estoppel claim, we have already found sufficient evidence of reasonable reliance. We need, therefore, address only whether Osborn made false representations and whether he intended Nilavar to rely on them.

Appellees contend that any representation Osborn might have made could not be false because it related to a future activity, *i.e.*, submitting a bid before the June 16, 1995 deadline. In *Link v. Leadworks Corp.* (1992), 79 Ohio App.3d 735, 742, 607 N.E.2d 1140, 1145, the Eighth Appellate District provided the following summary of the law respecting fraud and statements of future events:

"The general rule is that fraud cannot be predicated upon a representation concerning a future event. Mere predictions about the future, expectations, or opinions are not fraudulent misrepresentations unless those opinions are fraudulently made. However, a promise made with a present intention not to perform it is a misrepresentation of an existing fact—the speaker's present state of mind." (Citations omitted.) *Id.* at 742, 607 N.E.2d at 1145.

■ Thus, a breach of promise ordinarily will not give rise to a claim of fraud because promises tend to invoke future activity. Nevertheless, if a promissor intends at the time of his pledge not to act in accordance with it, his statements may constitute fraudulent misrepresentation. Consequently, if Osborn intended to mislead the SRI shareholders about submitting the proposal to Mercy, his representations could support a claim of fraud.

Appellees contend that there was no evidence that Osborn intended to mislead Nilavar. We disagree. Viewing the evidence, and the inferences that may be drawn from it, in appellant's favor, there is some indication that Osborn made intentional misrepresentations. The evidence shows that Osborn had already begun the process of forming DIA before the May 18, 1995 meeting. Yet Nilavar's evidence shows that Osborn misrepresented his intentions from that point onward. This evidence, therefore, precluded a grant of summary judgment upon Nilavar's fraud claim.

Accordingly, we sustain appellant's fourth assignment of error.

## VI

With his fifth and final assignment of error, Nilavar raises the following proposition of law:

"The trial court erred in granting summary judgment to DIA on Nilavar's claims for vicarious liability."

■ Nilavar asserts that DIA should be held liable for Osborn's actions on the grounds of *respondeat superior.* Nonetheless, DIA's certificate of incorporation was not filed until August 31, 1995. All of Dr. Nilavar's claims arise from events that occurred before that date.

■■ Prior to the filing of its corporate papers, a corporation has no legal existence. 18 American Jurisprudence 2d (1985) 939, Corporations, Section 120. Nor is the corporation identical with its promoters. *Id.* Because "[o]ne cannot be an agent for a nonexistent principal," *James G. Smith & Associates, Inc. v. Everett* (1981), 1 Ohio App.3d 118, 121, 1 OBR 424, 427, 439 N.E.2d 932, 935–936, a corporation cannot be held liable for the acts of a promoter that were performed before the corporation's existence.

■ Nevertheless, a corporation may adopt a contract made on its behalf by a promoter before incorporation. Furthermore, that adoption may be "manifested by the corporation's receipt of the contract's benefits with knowledge of its terms." *Illinois Controls, Inc. v. Langham* (1994), 70 Ohio St.3d 512, 522, 639 N.E.2d 771, 780. In the instant case, however, evidence shows that DIA enjoyed the benefits of the breach of contract, not the benefits of the contract itself.

Moreover, Osborn did not represent, nor could Nilavar have understood, that Osborn was acting on behalf of DIA. Compare *Langham* at 514–516, 639 N.E.2d at 774–776. Thus, we do not see any evidence that a contract with Nilavar was adopted by DIA.

Accordingly, we find that appellant's fifth assignment of error is not well taken, and we affirm the trial court's judgment with regard to any claims against DIA.

Having sustained appellant's first four assignments of error, we reverse the judgment of the trial court on all of Nilavar's claims against Osborn. Having overruled appellant's fifth assignment of error, however, we affirm the grant of summary judgment with regard to the claim against DIA. Accordingly, we remand the cause for further proceedings not inconsistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

GRADY and FAIN, JJ., concur.