JOURNAL ENTRY AND OPINION
Plaintiff-appellant James Onysko appeals from the summary judgment entered by the trial court in favor of the defendant-appellee Cleveland Public Radio (CPR) on plaintiff's claim of wrongful discharge. Plaintiff claims that disputed issues of material fact precluded summary judgment on his promissory estoppel claim. We find no error and affirm.
Cleveland Public Radio (CPR) is a not-for-profit organization which owns and operates WCPN (90.3 FM), a non-commercial radio station, serving the Northeastern Ohio metropolitan area. CPR began broadcasting in September 1984, and is a member of National Public Radio and an affiliate of Public Radio International. CPR has approximately thirty full time employees, all of whom are at-will employees.
Plaintiff started employment with CPR on April 20, 1989. He had no written employment contract at the time. He was employed in part-time positions throughout his CPR career until his termination on June 21, 1996. Throughout his tenure, he was paid at an hourly rate and was not salaried as were the full-time employees. He held the positions of: board operator from April 1989 until July 1991; board operator/music host from July 1991 to April 1993; and board operator/morning announcer from April 19, 1993 until his termination. On April 19, 1993, plaintiff and CPR entered into a formal letter agreement which specified the terms of his employment as follows:
 April 19, 1993 James P. Onysko 3003 East 63rd Street Cleveland, Ohio 44127
Dear Jim:
 I am pleased to be able to offer you the following terms of employment with Cleveland Public Radio. These conditions take the place of any prior understanding or agreement, but do not constitute a contract of continued employment for any definite period of time, and do not affect your status as an employee at will.
The terms of this agreement are as follows:
 1. Part-time compensation based on $7.75 per hour.
 2. Responsibilities include those identified in the attached job description.
3. A ninety-day probation term.
4. Start date of April 20, 1993.
 5. The maximum number of hours to be worked, during any given week, under these conditions will not exceed twenty-eight.
Please signify your acceptance of this offer, as defined in this letter, by signing.
 Sincerely, /S/ Kathryn P. Jensen Kathryn P. Jensen General Manager
 Agreed and accepted this 20th day of April, 1993. /S/ James P. Onysko James P. Onysko
Plaintiff's duties as board operator occurred during morning drive time, 5:00 a.m. to 10:00 a.m. Board operators operate the equipment needed to access and air or record the satellite signal of network feeds such as National Public Radio and Public Radio International; record and air self-cueing tapes for local programing; operate reel-to-reel recorders, cassette players, CD players, record turntables and microphones; do local on-air announcements such as station identification, time, weather and underwriting credits; keep the program log and enter transmitter readings on the transmitter log.
Plaintiff's immediate supervisor from April 1989 until January 1996 was James Goldurs, director of operations during that period. Goldurs reported directly to David Kanzeg, program director, who reported directly to CPR's president and general manager, Kathryn Jensen. Kanzeg supervised all of the creative staff and operations staff and oversaw the actual broadcast schedule and its component parts.
In the fall of 1993, CPR decided to add newscasts to the local breaks in Morning Edition by using a full-time reporter/newscaster to prepare and announce the news and information material and perform the duties of a reporter for the remainder of the workday. CPR hired Adam Mendoza for the position in December 1993. Plaintiff did not apply for the position but continued to perform the same duties he had been previously performing prior to Mendoza's arrival, i.e., operate the board and provide continuity by making weather, traffic, station identification and underwriting announcements. When Mendoza resigned in January 1995, CPR hired another full-time reporter/newscaster, Francine Kane, to perform the same duties Mendoza had performed.
Francine Kane left at the end of April 1995 when CPR did not extend her employment beyond her ninety-day probationary period.
At that time, CPR decided not to retain the position of reporter/newscaster formerly held by Mendoza and Kane. Instead, plaintiff was asked to assume the local news casting responsibility during the Morning Edition program.
Pursuant to a Board of Trustees strategic plan, CPR implemented several major institutional changes during 1995 and 1996. Those changes included a ten-month reconstruction of the station's physical facility; adding new technology; expanding the station's signal; and upgrading CPR's product, i.e., the sound on air and the quality of the content which was locally produced. CPR also adopted measurable goals which were tied to full-time employees' individual performance goals and their compensation and subsequently instituted a testing system for part-time employees. These measures involved a significant staff reorganization.
In November 1995, a number of staff reorganizations were announced. Anabelle Singh, who had served as CPR's director of news and public affairs since 1988, was appointed to the newly created position of director of broadcast systems. Singh assumed her new position in January 1996 and became plaintiff's immediate supervisor.
Ms. Singh began working with plaintiff in connection with developing his 1996 performance goals, conducted critiquing sessions, and generally attempted to communicate to him various areas where he needed to improve.
Plaintiff contends that around this time Kathryn Jensen conducted a general staff meeting where she made reference to the fact that she was aware that some of you are unhappy, we can work it out. (Pltf. Depo. at 59). Plaintiff believed she was referring to him due to his constant request for a full-time position and better pay.
On February 19, 1996, CPR announced the hiring of David Pignanelli for the position of director of news and public affairs, the post previously held by Ms. Singh. On Pignanelli's first day of work, March 18, 1996, plaintiff introduced himself to Pignanelli by telling him he needed a full-time job because he could not survive on what he was making, then $7.75 per hour. Pignanelli asked plaintiff to give him more time to settle in, he did not know what his budget was and he would need to look into the situation.
About a month later, plaintiff received a 50c/hour raise. Shortly after he arrived at CPR, Pignanelli proposed to Kanzeg the creation of a reporter/Morning Edition host position under the jurisdiction of the news department with a focus on news. This would considerably expand the scope of the morning host's responsibilities to include public radio reporter duties. In addition to general reporting duties, CPR reporters are responsible for producing one network-quality, broadcast-ready report each week. This effort takes twenty to thirty hours of the reporter's time. Many pieces take even longer to complete. Reporters usually have two or three reports in process concurrently. In view of the reporter/Morning Edition host's daily on-air responsibilities, he or she is expected to produce one story every two weeks.
Pignanelli's goal was to improve the news product and upgrade the morning sound.
Plaintiff contends that around mid April 1996, Pignanelli told him that his income would be doubled and he would be placed in the full-time morning host's position. Pignanelli, according to plaintiff, also several times said that the morning show was the Bob Edwards and James Onysko in the morning show. (Pltf. Depo. at 147). Pignanelli stated that he did state this, but only meant he wanted viewers to see the morning show not just as a national program with Bob Edwards, but also a local show with a local host. (Pignanelli Depo. at 41).
Once CPR decided to create that new position, both Singh and Pignanelli concentrated on critiquing and instructing plaintiff in an effort to determine whether he could improve to the point where he could perform the board operator and news reading portion of the projected job. Singh and Pignanelli prepared notes and memos of record memorializing these efforts during April/May of 1996. This memoranda reflected criticism of plaintiff's recurring performance problems; particularly, his failure to plan and execute his breaks cleanly; failure to demonstrate solid news editorial judgment; air underwriting spots as scheduled; and make his on-air announcing style more engaging. Kanzeg's assessment of plaintiff's performance paralleled that of Singh and Pignanelli, based on his listening to plaintiff's on-air performance every day.
Plaintiff admitted to discussions about Pignanelli and Singh's efforts to improve the morning product, including his on-air performance. It was pointed out that plaintiff needed to provide tangible evidence of improvement and demonstrate consistently excellent air shifts in order for them to recommend to Kanzeg that he be considered for the new reporter/Morning Edition host position. Singh even directed a memo to plaintiff dated May 8, 1996 reiterating this position. Upon receipt of Singh's memo, plaintiff admitted he was waiting it out.
In addition to plaintiff's perceived inconsistent, on-air performance, his superiors believed that he displayed a defensive attitude, resisting constructive criticism and making excuses rather than addressing corrective action. He blamed equipment and other staff for his performance and complained that too much was expected of him. He did not demonstrate much initiative, often complaining about not having enough time. He gave no priority to projects designed to help him improve his performance.
Moreover, he seldom remained at work beyond 10:30 a.m. in order to complete tasks, discuss performance issues, or work on ways to improve his performance. When Pignanelli informed plaintiff on April 30, 1996 that he was adding two minutes of news headlines to each hour of the Morning Edition broadcast, plaintiff said he considered that extra work and reiterated his desire to have a full-time job and be paid more.
He also behaved in a very volatile manner. He would get angry, slam doors and shout. He stormed out of meetings. During a critique session in mid-June, plaintiff told Singh that CPR should fire him if management did not think he could do the job. Goldurs witnessed tirades by plaintiff for several months during which plaintiff complained about being treated unfairly by Singh, Pignanelli and Jensen. In early June, when plaintiff believed he was going into a meeting with Kanzeg and Pignanelli to be given the full-time job he coveted, he opened the meeting with the statement, sometimes I come up here and I weep * * * how I feel so badly at how you're treating me. At this meeting, Kanzeg informed him that plaintiff had to continue to work to improve the morning product.
Despite the efforts of Kanzeg and Pignanelli to explain to plaintiff the need for improved performance, it became clear to those supervisors that plaintiff could not handle the more demanding and complex duties of the new position of reporter/Morning Edition host. Moreover, he could not continue in his present position of part-time board operator/morning host, because it was being eliminated with the creation of the new full-time position. In light of plaintiff's volatile demeanor, his uncooperative attitude, his demands for a full-time job and more compensation, CPR management decided he could not work cooperativelyin some other part-time position. They did not want to risk leaving him on the air once CPR began recruiting for the new position. Therefore, plaintiff's employment was terminated on June 21, 1996.
CPR posted and advertised the new reporter/Morning Edition host position during the week of July 8, 1996. From a pool of fifteen applicants, CPR selected Lorna Jordan who had extensive experience in public radio reporting. Jordan began her employment in October 1996. During the recruiting period, several part-time board operators filled in on the morning shift.
Plaintiff's sole assignment of error states as follows:
 I. THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEE'S MOTION FOR SUMMARY JUDGMENT. THE COURT PROVIDED NO DECISION, NOR ANY REASON FOR ITS DECISION.
Appellate review of summary judgments is de novo. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105; Zemcik v. La Pine Truck Sales Equipment (1998), 124 Ohio App.3d 581, 585. The Ohio Supreme Court recently restated the appropriate test in Zivich v. Mentor Soccer Club (1998), 82 Ohio St.3d 367, 369-70 as follows:
 Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. Horton v. Harwick Chem. Corp. (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Dresher v. Burt (1996), 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264, 273-274.
Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E). Mootispaw v. Eckstein (1996), 76 Ohio St.3d 383, 385. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 358-59.
Under Ohio law, an oral agreement of employment of no fixed duration is at will, meaning that the employee is free to seek work elsewhere and that the employer may discharge the employee without cause. Tohline v. Central Trust Co. (1988), 48 Ohio App.3d 280,282. In Mers v. Dispatch Printing Co. (1985), 19 Ohio St.3d 100, the Ohio Supreme Court reaffirmed the validity of the employment-at-will doctrine. Under this doctrine, an individual who is employed for an indefinite term may be discharged by the employer at any time, for any reason not contrary to law, or for no reason at all. See, also, Henkel v. Educational Research Council of America (1976), 45 Ohio St.2d 249; Phung v. Waste Management, Inc. (1986), 23 Ohio St.3d 100, 102.
Pursuant to the April 19th letter agreement accepted by plaintiff, he understood that he did not have a contract of continued employment for any definite period of time, and the [terms did] not affect your status as an employee at will. Thus, plaintiff was clearly an employee-at-will which he acknowledged when he signed the April 19, 1993 letter and the receipt for the CPR Personnel Policies Handbook, which stated:
 I understand that his handbook does not constitute a contract of employment. I also understand that my employment is at-will and that I may leave at any time and that the station may discharge me at any time with or without cause.
Plaintiff has not identified any CPR document which modified in any way his at-will status. Thus, throughout his employment, plaintiff remained an at-will employee who could be discharged at any time with or without cause unless defendant's oral promises brought plaintiff's claims within the promissory estoppel exception to the at-will rule.
An employer's right to discharge may be limited by promises or representations made to an employee which fall within the doctrine of promissory estoppel. Mers, supra at 104. However, in order to withstand a motion for summary judgment on this issue, plaintiff must demonstrate a genuine issue of material fact with regard to his promissory estoppel claim. Those elements are well-defined and have been repeatedly stated as follows: (1) there must be a promise clear and unambiguous in its terms; (2) there must be reliance by the party to whom the promise is made; (3) the reliance must be reasonable and foreseeable; and (4) the party claiming estoppel must be injured by the reliance. Cohen Co. v. Messina (1985),24 Ohio App.3d 22, 26.
To prevail on a promissory estoppel claim, any alleged promises must be clear and unambiguous in their terms. Rudy v. Loral Defense Systems (1993), 85 Ohio App.3d 148, 154. Further, these clear and unambiguous promises must be specific promises of job security. Id.See, also, Wing v. Anchor Media Ltd. of Texas (1991), 59 Ohio St.3d 108, paragraph 2 of syllabus; Simonelli v. Anderson Concrete Co. (1994), 99 Ohio App.3d 254. A promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the employment-at-will doctrine. Wing, supra at paragraph two of syllabus. We find that none of the statements plaintiff attributes to CPR management personnel and cites as promises included any promise of continued employment for any fixed or definite duration. Therefore, we find that plaintiff failed to establish that any genuine issue of material fact exists as to the first and fourth elements of his promissory estoppel claim. Accordingly, his claim failed as a matter of law and summary judgment was proper.
The first promise on which plaintiff relies to support his promissary estoppel claim is a comment by Goldurs. Plaintiff testified that on his self-performance evaluation for 1995, he wrote the following comment dated January 18, 1996:
 I am no longer a board op, solely, I am making editorial decisions, working intensely with the news staff on a daily basis and presenting the news. I do not merely want an exceeds or meets designation, I want a job classification change and a salary commensurate with the responsibility.
Plaintiff testified Goldurs showed that document to Kanzeg, and Jim Goldurs told me that Dave Kanzeg agreed with me. (Pltf. Depo. at 96). Plaintiff offers no other detail as to what in that document Kanzeg allegedly agreed with, much less what he agreed to. Goldurs testified that when he told Kanzeg plaintiff wanted a full-time job with benefits, Kanzeg said, we would all like to have more money. We would all like to have better hours. We all would like to have benefits, but we are not in a position to be able to accommodate. In any event, plaintiff admitted that he was given a fifty-cent pay raise in March 1996. Thus, any promise which plaintiff could have extracted from the comment was fulfilled. But, in any event, there is nothing in these comments to suggest a tenure for any specific period of time.
The remark by Kathryn Jensen fares no better. She apparently remarked that she had heard that some employees were unhappy with their work conditions and that it could be worked out. (Pltf. Depo. at 59). Plaintiff further testified, I know I was one of those that she was referring to because I had been agitating and vocalizing my desire to have a full-time job at CPR for many months and years up to that point. (Pltf. Depo. at 59). However, Jensen said nothing else in that staff meeting that led plaintiff to believe he would be entitled to a full-time position or any kind of pay raise, nor did she at any time say anything else that led him to believe he was going to be given the full-time position of reporter/Morning Edition host.
There is no evidence that Jensen was singling him out with this comment, much less making a clear and unambiguous promise of continued employment, a pay increase, or any full-time position. Under these facts, Jensen's comment clearly does not support a promissory estoppel claim.
The statements plaintiff alleges Davie Pignanelli made to him on March 18, 1996, Pignanelli's very first day of employment at CPR, are equally ambiguous. When plaintiff's shift ended at 10:00 a.m., he went to Pignanelli's office and told Pignanelli, I don't want to leave here but I can't afford to stay here anymore. Pignanelli, who had never spoken to plaintiff before, responded according to plaintiff, please give me some time, let me see what my budget is. Plaintiff also alleges that Pignanelli said he had told people at the station that it was wrong that plaintiff was doing a news casting job and being classified still as this board operator. Plaintiff also pointed out that Pignanelli had told him the morning show was the Bob Edwards and James Onysko show. However, plaintiff also acknowledged that Pignanelli and Singh had informed him they could not recommend him to the position unless he made recommended improvements. These statements do not constitute a sufficiently clear and ambiguous promise of job security to support plaintiff's promissory estoppel claim.
Each of the foregoing comments by Kanzeg, Jensen and Pignanelli, all of which plaintiff contends occurred on or before March 18, 1996, lacks on its face the clarity and specificity required by law and cannot form the basis of any promissory estoppel claim. Consequently, they were properly disregarded by the trial court.
Plaintiff's other attempts to characterize various comments as clear and unambiguous promises of full-time employment, and even as promises of the newly created full-time position of reporter/Morning Edition host, are unavailing comments. Indeed, plaintiff's own conduct clearly demonstrated that even he considered the comments to be no more than mixed signals.
From January 1994 until May 1995, CPR continuously had both plaintiff and a reporter/newscaster handle local announcing and news reading responsibilities during Morning Edition. When the reporter/newscaster left in May 1995, CPR assumed a holding pattern during the morning drive shift, with plaintiff continuing to operate the board and assuming news reading duty, but no reporter responsibilities. In January 1996, Singh became plaintiff's supervisor. After Pignanelli replaced Singh as director of news and public affairs in mid-March 1996, the decision was made to create a new full-time position which would combine the part-time responsibilities plaintiff was then performing as board operator/morning announcer with the responsibilities of a reporter. That position was in various stages of development during Spring 1996. During the same period, CPR was upgrading its standards, particularly with respect to its news product and local sound. CPR decided to afford plaintiff an opportunity to meet the upgraded standards of on-air news reading and announcing that would be expected of the new reporter/Morning Edition host.
Plaintiff admitted that: he knew Pignanelli had a plan to improve the morning product, some of which dealt with plaintiff; he had discussions with both Singh and Pignanelli about ways he needed to improve his on-air performance; and he received a memo from Singh dated May 8, 1996 indicating that he needed to provide tangible evidence of improvement and demonstrate consistently excellent air shifts in order for Singh and Pignanelli to recommend to Kanzeg that plaintiff be considered for the new position. From March 1996 until June 1996, plaintiff knew he was being evaluated and critiqued by his new supervisor (Singh) and a new news director (Pignanelli), under new and more rigorous standards with the goal of an improved news product and sound.
On May 7, 1996, plaintiff informed Pignanelli he had been ready to quit the day before. On May 16, 1996, he told Pignanelli that if he did not hear anything positive from management by June 1, 1996" he would probably quit by the third week of June. On May 21, 1996, without any assurance of a full-time job, plaintiff told Pignanelli he would return to work after his Paris vacation since he did not yet have another job lined up. These reactions would suggest that promises of full-time employment had not been made.
Furthermore, in June 1996, plaintiff opened a meeting with Kanzeg and Pignanelli by complaining about how badly CPR was treating him. On June 18, 1996, he told Singh that CPR should fire him if CPR did not think he could do the job. These expressions of doubt and anger, complaints about this treatment, and repeated threats to quit, also suggest that he did not believe CPR had promised him a full-time position much less any job security at all. In any event, a promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the well-established doctrine of employment-at-will. Wing, supra at 110-11; see, also, Srail v. RJF International Corp. (1998), 126 Ohio App.3d 689, 709
(statements that if employees worked hard and were successful, they would be presented with unbelievable opportunities for professional growth promotion, and security were not sufficient promises of continued employment); Condon v. Body, Vickers and Daniels (1994), 99 Ohio App.3d 12, 20-21 (vague, indefinite promises of future employment will not support a promissory estoppel claim); Scanlon v. Tremco (Dec. 3, 1998), Cuyahoga App. No. 73808, unreported (statements by employer that plaintiff had bright future with company were not specific enough for promissory estoppel claim); Corradi v. Soclof (May 25, 1995), Cuyahoga App. No. 67586, unreported (Statements praising job performance or promising career advancement opportunities do not alter an at-will status).
Plaintiff's promissory estoppel claim fails on a second basis as well. He did not show that he relied on any statements by CPR personnel to his detriment.
Plaintiff primarily based the detrimental reliance element of his promissory estoppel claim on his allegation that he relied on CPR's promises in failing to seek employment elsewhere * * *. However, plaintiff's own testimony and the law make it clear that he was not injured by failure to seek other employment.
The undisputed facts established that: plaintiff was hired for a part-time position at CPR in April 1989; throughout his seven years of employment with CPR, he provided only part-time services and worked only part-time shifts; as an at-will employee, he was free to leave his job at CPR at any time; he indicated to CPR as early as 1992 that he was interested in full-time employment; he contended that he had been agitating and vocalizing my desire to have a full-time job at CPN for many months and years up to that point [February 1996.] However, he did not even apply for full-time positions at CPR as they became available, e.g., reporter/newscaster in Fall 1993; editorial production assistant in Fall 1994; reporter in July 1994; and reporter in December 1994. Thus, plaintiff worked part-time at what he characterized as slave labor wages, for nearly seven years without so much as a hint of possible full-time work at CPR and with no effort on his part to apply for available full-time positions at CPR.
The record reveals that plaintiff had stopped looking for other employment before any of the statements on which he relies were allegedly made and for reasons unrelated to any of those alleged statements.
In any event, plaintiff cannot demonstrate that he was injured by his failure to look for other employment. He did not offer any evidence that any jobs were, in fact, available between March 18, 1996 and June 21, 1996, which he would have applied for in the absence of CPR's alleged promises. In view of his failure to elicit even one employment offer from his three-year job search prior to March 18, 1996, or from his eighteen-month job search following his termination, any suggestion by plaintiff that he would have found employment in the three months between March 18, 1996 and June 21, 1996 but for the alleged promises is not supported by the evidence.
Plaintiff's speculation cannot establish the requisite detrimental reliance to support a promissory estoppel claim. Reliance to support an estoppel claim must be of a sufficiently definite and substantial nature so that injustice will result if the `promise' is not enforced. Talley v. Teamsters, Local No. 377 (1976), 48 Ohio St.2d 142, 146. Many courts have found that as a matter of law, refraining from seeking other employment cannot constitute detrimental reliance unless the employee, in relying on the promise, in fact, rejected employment offers. See cases cited in Nilavar v. Osborn (1998), 127 Ohio App.3d 1, 17-18. As the court found in Nilavar, [w]ithout evidence that [the plaintiff] would have found employment, during whatever lapse in time was caused by his reliance, no court could determine what damages, if any, resulted from his reliance. Id. at 18. See, also, Srail v. RJF Internat'l Corp. (1998), 126 Ohio App.3d 689, 709; Pyle v. Ledex (1988), 49 Ohio App.3d 139, 146 (no detrimental reliance where record contains no specific examples of any other jobs or positions the employee passed over).
As a matter of law, refraining from seeking other employment cannot amount to detrimental reliance unless the at-will employee, in relying on the promise, actually rejected employment offers. Nilaver v. Osborn, supra at 17-18; Eagleye v. TRW, Inc. (Feb. 17, 1994), Cuyahoga App. No. 64662, unreported at 4. An at-will employee who claims reliance in not looking for other work cannot distinguish himself from an employee who simply continues working. Humphreys v. Bellaire Corp. (C.A.6, 1992), 966 F.2d 1037, 1041.
Plaintiff's sole assignment of error is overruled.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
 ________________________ JAMES M. PORTER, J.
DYKE, A.J., and ANNE L. KILBANE, J., CONCUR.