[Cite as *Firefighters Community Credit Union v. Woodside Mtge. Servs., Inc.*, 2019-Ohio-3363.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

FIREFIGHTERS COMMUNITY : 
CREDIT UNION,

      Plaintiff-Appellant, :

                          No. 107134

      v. :

WOODSIDE MORTGAGE : 
SERVICES, INC.,

      Defendant-Appellee. :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 22, 2019

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-16-858763

---

### *Appearances:*

Weltman, Weinberg & Reis Co., L.P.A., and Daniel A. Friedlander, *for appellant.*

Walter Haverfield L.L.P., Mark S. Fusco, and Sara Ravas Cooper, *for appellee.*

SEAN C. GALLAGHER, P.J.:

{¶ 1} Firefighters Community Credit Union (the "Credit Union") appeals from the summary judgment entered in favor of defendant-appellee Woodside Mortgage Services, Inc. ("Woodside") on its counterclaim for declaratory judgment,

the denial of the Credit Union's motion for summary judgment on its claims for breach of contract and conversion, and the trial court's declaration that Woodside had the right to service all loans originating from the Credit Union through April 4, 2018. For the following reasons, we affirm.

{¶ 2} Woodside is a mortgage origination and servicing company that began originating mortgage loans for the Credit Union on a probationary basis in late 2007. On September 18, 2007, the Credit Union and Woodside entered into a "Letter of Agreement" (the "letter agreement") formalizing their arrangement. The mortgage loans Woodside originated for the Credit Union's members could either be retained by the Credit Union for its own loan portfolio or sold to the secondary mortgage market, wherein the servicing would be handled by the purchaser. Initially, all mortgage loans originated by Woodside were sold to the secondary mortgage market. At some point in early 2008, the Credit Union decided to begin funding certain loans Woodside originated for its members and asked Woodside if it would service these loans. The letter agreement, entitled "Mortgage Loan Servicing," provided in pertinent part that a "separate servicing agreement may be executed between the Parties and/or their affiliates to service these loans on an ongoing basis."

{¶ 3} The parties did not sign a separate, written mortgage loan servicing agreement. On May 20, 2008, William Keller, who was then Woodside's vice president, sent an email to Terrance Corrigan, the Credit Union's chief lending officer, that included "a summary of proposed terms for servicing loans on behalf of

the Credit Union." The email stated that the "[c]ompensation items noted reflect *your* current arrangements" (emphasis added), with three exceptions unrelated to the parties' dispute here. Corrigan acknowledged that the fee schedule reflected the compensation that the Credit Union was then paying to other mortgage loan services. Keller asked that Corrigan "review" the proposed terms and "let me know how to proceed." Attached to the email was a "Mortgage Loan Servicing Agreement Term Sheet" (the "May 2008 term sheet"). The May 2008 term sheet stated in relevant part Woodside "shall own the servicing rights to any and all loans" and also stated that Woodside "shall bear all costs to service the mortgage loans" and "shall be compensated for providing this service" based on the "annual servicing fees" as specified in the term sheet.

{¶ 4} The Credit Union was Woodside's first client. Between 2008 and 2012, Woodside was originating and servicing mortgage loans only for the Credit Union. In 2012, Woodside began originating and servicing mortgage loans for other financial entities.

{¶ 5} In 2012, Keller sent Corrigan a draft "Mortgage Loan Origination and Servicing Agreement" (the "2012 proposed loan servicing agreement"). Keller forwarded the draft agreement to the Credit Union because Woodside had "paid an attorney to put * * * a new agreement together," that "this is what we were now submitting to our new credit union clients" and that Woodside was "trying to standardize the contracts across all clients." Woodside never discussed the draft agreement with the Credit Union, and it was never signed.

**{¶ 6}** On June 11, 2013, Keller, who was now Woodside's president and CEO, sent an email to Corrigan regarding a discrepancy in the fees Woodside had been collecting from the Credit Union on certain files. He attached a copy of the May 2008 term sheet and indicated that it was "the servicing term sheet we have on file for the Credit Union." The Credit Union did not object to Keller's representation that the May 2008 term sheet represented the parties' agreement. Keller further stated:

> This should match up with your copy; let me know if it does not. The terms list a per loan $240 minimum per year ($20/month). Some of the Credit Union files were set up incorrectly without the minimum. Accordingly, the servicing fee collected was less than the minimum $20 for loans affected. No big deal but wanted to let you know for the future.

There is no evidence Corrigan responded to the email; however, there appears to be no dispute that from at least May 20, 2008, the Credit Union compensated Woodside for loan servicing according to the amounts specified in the May 2008 term sheet.

**{¶ 7}** In November 2015, the Credit Union decided to terminate its servicing relationship with Woodside and begin servicing the mortgage loans "in-house." Corrigan indicated that the Credit Union expected to be ready to service its mortgage loan portfolio by March or April 2016 and that the Credit Union would need Woodside's assistance in compiling and transferring data files for this transition to occur. In response, Keller informed Corrigan that, because Woodside owned the servicing rights to the loans, if the Credit Union wanted to begin servicing

the existing mortgage loans, the Credit Union would have to purchase the rights to service those loans. Keller claimed that it was "industry standard" for the servicer of the loan to retain the servicing rights. Woodside did not make any claims intending to preclude the Credit Union from servicing its loans prospectively. Despite the parties' dispute regarding the servicing rights, the Credit Union continued to use Woodside to originate and service its mortgage loans through 2018.

{¶ 8} On February 10, 2016, the Credit Union filed a complaint asserting claims of breach of contract and conversion against Woodside. The Credit Union alleged that Woodside breached the letter agreement by "fail[ing] to terminate as agreed to" in the letter agreement, by refusing to return accounts and to assist in the transition of servicing to allow the Credit Union to properly service its mortgage loans. The Credit Union further alleged that Woodside's failure to return the mortgage loan portfolio to the Credit Union for servicing constituted a conversion of the Credit Union's property. The Credit Union sought to recover compensatory damages in excess of $25,000 plus punitive damages, its attorney fees, and costs.

{¶ 9} Woodside filed an answer and a counterclaim for declaratory judgment. In its answer, Woodside admitted that the parties had entered into the letter agreement and had not signed the 2012 proposed loan servicing agreement, but otherwise denied the material allegations of the complaint. It also asserted various affirmative defenses. With respect to its counterclaim, Woodside alleged that the parties had been operating pursuant to the May 2008 term sheet since 2008 and that pursuant to the terms of the May 2008 term sheet, Woodside "owned the

servicing rights" to all loans it originated from the Credit Union. Woodside requested that the court enter a declaratory judgment, declaring that it "shall maintain the right to service all loans originating from [the Credit Union] through the date of any decision by this Court" and awarding Woodside its costs and attorney fees.

{¶ 10} The parties filed cross-motions for summary judgment on the Credit Union's claims and Woodside's counterclaim, both claiming the matter was ripe for adjudication under Civ.R. 56. In its motion for summary judgment, the Credit Union argued that the material facts were not in dispute and that (1) the May 2008 term sheet was not a contract, (2) it had a right to terminate Woodside's servicing of its mortgage loan portfolio at any time under the terms of the letter agreement, (3) there was no evidence of any enforceable agreement pursuant to which the Credit Union agreed "to give Woodside the non-terminable and irrevocable right to service its mortgages for the duration of the life of those mortgages," and (4) Woodside's retention of the Credit Union's mortgage data constituted a breach of the letter agreement and conversion. In support of its motion, the Credit Union attached copies of the letter agreement, the May 2008 term sheet, the 2012 proposed loan servicing agreement and the correspondence between the parties, Keller's deposition transcript, and an affidavit from the Credit Union's president and CEO Ben Laurendeau.

{¶ 11} In his affidavit, Laurendeau averred that the Credit Union had never agreed to transfer the servicing rights to its mortgage loan portfolio to Woodside,

that due to its "close relationship" with its members, the Credit Union would never enter into a relationship with a vendor in which it could not "hold that vendor accountable or otherwise terminate the relationship at will for poor service, cost savings, or any other similar issue potentially benefitting it[s] members" and that the "anticipated savings associated with transitioning servicing from Woodside" would have been $107,824.18 from December 15, 2015, through January 17, 2017. The Credit Union requested (1) that the court order Woodside to transfer the mortgage-portfolio data to the Credit Union; (2) that the Credit Union be awarded damages "based upon the difference between [the Credit Union's] cost for servicing the mortgages 'in-house' and Woodside's servicing fees during the period that the servicing was terminated"; and (3) "indemnification" for its "costs and expenses incurred in this action."

{¶ 12} In its motion for summary judgment, Woodside argued that, based upon the undisputed evidence in the record, reasonable minds could only conclude that (1) Woodside had performed all of its obligations under the letter agreement and the loan servicing agreement; (2) Woodside retained the servicing rights for all loans under the parties' agreements; (3) that the Credit Union was not entitled to assume servicing responsibilities for any loans originated by Woodside; and (4) the Credit Union had produced no evidence that it had sustained any damages as a result of Woodside's actions. In support of its motion, Woodside attached excerpts from the depositions of Corrigan, Laurendeau, and Keller; the Credit Union's responses to Woodside's discovery requests and copies of the letter agreement; the

May 2008 term sheet; the 2012 proposed loan servicing agreement; and the correspondence between the parties. Woodside requested that the trial court enter summary judgment in its favor on the Credit Union's claims and Woodside's counterclaim, that it issue a declaration that Woodside "shall maintain the right to service all loans originating from [the Credit Union] through the date of any decision by [the trial court]," and that it hold the Credit Union "responsible for all costs incurred relative to Woodside's [c]ounterclaim."

{¶ 13} On April 4, 2018, the trial court concluded as follows:

> Although the loan servicing agreement was not signed by the parties, it is undisputed that since 2008, the credit union has compensated Woodside for mortgage loan servicing pursuant to the loan servicing agreement. * * * This court finds that the credit union accepted the loan servicing agreement without objection and assented to the fee schedule set forth therein for eight years. The parties here are both sophisticated business entities who knowingly entered into this agreement. The language of the agreement is clear that Woodside owns the servicing rights to any serviced loans and that the servicing rights remain throughout the life of the loan.

Based on this reasoning, the trial court granted Woodside's motion for summary judgment on its counterclaim, denied the Credit Union's motion for summary judgment, and ordered that Woodside "shall maintain the right to service all loans originating from [the Credit Union] through the date of this order."[1]

---

[1] Additional briefing was sought on this court's jurisdiction because the trial court's final judgment did not discuss the Credit Union's breach of contract and conversion claims. Even if all claims involving all parties are not expressly adjudicated by the trial court, "if the effect of the judgment as to some of the claims is to render moot the remaining claims or parties, then compliance with Civ.R. 54(B) is not required to make the judgment final and appealable." *Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.*, 44 Ohio St.3d 17, 21, 540 N.E.2d 266 (1989); *see also Wise v. Gursky*, 66 Ohio St.2d 241, 243, 421 N.E.2d 150 (1981). Because the declaratory relief entered in favor of Woodside could not survive

{¶ 14} The Credit Union appealed, claiming that the trial court erred in holding that the continuing payment of mortgage servicing fees conveyed ownership of the servicing rights to the mortgage servicer and that the trial court erred by failing to grant summary judgment in favor of the Credit Union and against Woodside for breach of contract and conversion. Neither argument has merit.

{¶ 15} Appellate courts review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). No deference is afforded to the trial court's decision, and an independent review of the record is conducted to determine whether summary judgment is legally appropriate. Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.

{¶ 16} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record

independent of the Credit Union's breach of contract and conversion claims, the judgment entered is final and appealable.

demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

{¶ 17} In its first assignment of error, the Credit Union contends that the trial court erred in granting summary judgment in favor of Woodside on its counterclaim for declaratory judgment and in determining Woodside "owned" the servicing rights to each of the loans at issue "throughout the life of the loan" because there was no evidence of any enforceable agreement by the Credit Union to transfer the servicing rights associated with its mortgage loan portfolio to Woodside.

{¶ 18} Contract formation requires an offer, acceptance, consideration, and mutual assent between two or more parties with the legal capacity to act. *See, e.g., Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16 ("'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'"), quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D. Ohio 1976); *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376, 683 N.E.2d 337 (1997). For a contract to be enforceable, there must be a "meeting of the minds" as to the essential terms of the agreement, i.e., the essential terms of the agreement must be "'reasonably certain and clear'" and mutually understood by the parties. *Kostelnik* at ¶ 16-17, quoting *Rulli* at 376; *see also Episcopal Retirement Homes v. Ohio Dept.*

*of Indus. Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991) (To "declare the existence of a contract," both parties must consent to its terms, there must be a meeting of the minds of both parties and the contract must be "definite and certain.").

{¶ 19} As the Ohio Supreme Court explained in *Rulli*:

> A court cannot enforce a contract unless it can determine what it is. * * * [The parties] must have expressed their intentions in a manner that is capable of being understood. It is not even enough that they had actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are.

*Rulli* at 376, quoting 1 *Corbin on Contracts*, Section 4.1, at 525 (Rev.Ed.1993). The burden of establishing the existence and terms of an agreement lies with the party who claims it exists. *Turoczy Bonding Co. v. Mitchell*, 8th Dist. Cuyahoga No. 106494, 2018-Ohio-3173, ¶ 19, citing *Nilavar v. Osborn*, 127 Ohio App.3d 1, 11, 711 N.E.2d 726 (2d Dist.1998).

{¶ 20} Based on the record before us, there is no genuine issue of material fact that (1) the parties agreed to the letter agreement, and (2) the parties were operating under the May 2008 term sheet — separate from, and in addition to, the letter agreement — relating to the servicing of the mortgage loans originated by Woodside that the Credit Union retained in its mortgage loan portfolio (the "mortgage loan servicing agreement"). What is in dispute is whether the May 2008 term sheet was the basis of the servicing agreement between the parties, which Keller unambiguously testified that it was, or whether the parties had some form of

oral agreement predating the May 2008 term sheet as to the servicing arrangement and the associated fees.

{¶ 21} On this latter point, the Credit Union claims that Corrigan's "belief" that the servicing arrangement commenced before the exchange of the May 2008 term sheet was dispositive. The Credit Union, however, provided no evidence that Woodside had begun servicing loans before the May 2008 term sheet was exchanged other than Corrigan's self-serving "belief" that Woodside began servicing loans from the inception of the parties' relationship. *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. Franklin No. 11AP-1068, 2012-Ohio-5036, ¶ 40 (statements alleging a belief in the existence of a fact of consequence are insufficient to demonstrate issues of material fact for trial).

{¶ 22} Woodside contends that the parties agreed that Woodside would service the loans in the Credit Union's mortgage loan portfolio consistent with the terms set forth in the May 2008 term sheet — including that "[Woodside] shall own the servicing rights to any and all loans" — and that the Credit Union demonstrated its assent to those terms (1) through Corrigan's alleged statement to Keller that they were "good to go" after Keller forwarded the term sheet to Corrigan in May 2008 and (2) by compensating Woodside for its services as provided for in the May 2008 term sheet for more than eight years.

{¶ 23} The Credit Union, in response, argues that the "only understanding 'assented to'" was a "servicing fee schedule in place before the May 2008 term sheet]" and that the May 2008 term sheet was simply an attempt by Woodside to

"slip in" an additional term, not agreed to by the parties, after the fact. In support, the Credit Union directs our attention to Keller's email that accompanied the May 2008 term sheet, in which Keller referenced the fact that the fee schedule reflected "your" current arrangements. According to the Credit Union, this statement proves that Woodside was servicing loans before the May 2008 term sheet was exchanged. However, Corrigan also testified that the fee schedule Woodside adopted was based on the arrangements the Credit Union then had with other loan servicing entities. Keller's use of the word "your," instead of "our" reflects this notion. The Credit Union's argument, that Woodside began servicing mortgage loans retained by the Credit Union without a written fee agreement, would be more availing had Keller claimed that the fee schedule reflected "our" current arrangements. Regardless, Keller unambiguously testified that Woodside did not begin servicing mortgage loans at all until after the exchange of the May 2008 term sheet with the Credit Union took place. Corrigan's "belief" otherwise is not sufficient to create a genuine issue of material fact.

{¶ 24} The Credit Union also contends that (1) there was no consideration for any alleged agreement by the Credit Union to transfer ownership of the loan servicing rights to Woodside and (2) such an agreement would violate the statute of frauds and the terms of the letter agreement because there is no writing signed by the Credit Union transferring the loan servicing rights to Woodside or otherwise acknowledging Woodside's "ownership" of those servicing rights.

{¶ 25} The Credit Union's lack-of-consideration argument is unavailing. Although the Credit Union contends there is no evidence that Woodside ever "tendered any consideration whatsoever" for its "purported ownership right" to service the loans in the Credit Union's mortgage loan portfolio, there is no dispute that Woodside agreed to service (and, in fact, serviced) each of the loans Woodside originated that the Credit Union chose to retain in its mortgage loan portfolio instead of sending to the secondary mortgage market. Simply because Woodside received servicing fees for servicing the loans does not mean that the parties agreed that was the only consideration Woodside was to receive for servicing the loans at issue.

{¶ 26} The record reflects that a significant investment was needed in order to effectively service the Credit Union's mortgage loans. Keller testified that from 2008 until 2012, the Credit Union was the only entity for which Woodside was originating and servicing loans. Although the Credit Union contends that it would never enter into a relationship with a vendor in which it could not "hold that vendor accountable or otherwise terminate the relationship at will for poor service, cost savings, or any other similar issue potentially benefitting it[s] members," such evidence is beyond the four corners of the parties' initial written agreement. Had that been a consideration, it should have been included in the parties' written agreement. And although the Credit Union attempts to downplay Woodside's investment, the Credit Union also asserts that the reason it continued to have Woodside service new loans for the Credit Union after the Credit Union sent its

"termination letter" was because the "economies of scale weren't there" and it would not have been economical for the Credit Union to service its mortgage loans "in house" unless it could service all of the loans in its mortgage loan portfolio that were then being serviced by Woodside. In other words, according to the Credit Union, a sizeable investment is necessary to effectively service the loans the Credit Union retains after origination. This investment constitutes consideration for the ownership of the servicing rights for the life of each mortgage loan originated by Woodside.

{¶ 27} The Credit Union's statute-of-frauds argument is equally unavailing. Ohio's statute of frauds provides in relevant part:

> No action shall be brought * * * upon a contract or sale of lands, tenements, or hereditaments, or interest in or concerning them, or upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

R.C. 1335.05. The Credit Union has not shown that enforcement of the alleged mortgage loan servicing agreement at issue would implicate the statute of frauds. An agreement between a financial institution and a mortgage loan servicer relating to loan servicing does not relate to or "concern" any right, title or interest in real property. As such, it is not an agreement "upon a contract or sale of lands, tenements, or hereditaments, or interest in or concerning them."

{¶ 28} Further, an agreement that is capable of being performed within one year does not violate the provision of the statute of frauds, which states that a

contract that is "not to be performed within one year" must be made in writing. As the Ohio Supreme Court explained in *Sherman v. Haines*, 73 Ohio St.3d 125, 127, 652 N.E.2d 698 (1995):

> For over a century, the "not to be performed within one year" provision of the Statute of Frauds, in Ohio and elsewhere, has been given a literal and narrow construction. The provision applies only to agreements which, by their terms, cannot be fully performed within a year, and not to agreements which may possibly be performed within a year. Thus, where the time for performance under an agreement is indefinite, or is dependent upon a contingency which may or may not happen within a year, the agreement does not fall within the Statute of Frauds.

(Citations omitted); *see also Shaver v. Priore*, 8th Dist. Cuyahoga No. 71298, 1997 Ohio App. LEXIS 3526, 7 (Aug. 7, 1997) ("The law in Ohio is well settled that: 'A contract which is not likely to be fully completed within a year, and which in fact is not completed within a year, does not automatically violate the Statute of Frauds if, at the time the contract is made, there is a possibility in law and in fact that full performance such as the parties intended may be completed before the expiration of a year.'"), quoting *Bryan v. Looker*, 94 Ohio App.3d 228, 234, 640 N.E.2d 590 (3d Dist.1994).

{¶ 29} The Credit Union has not shown that the alleged mortgage loan servicing agreement was incapable of full performance within one year. The parties' obligations under the alleged mortgage servicing agreement were contingent upon loans being originated by Woodside and retained by the Credit Union for its own loan portfolio. There was no guarantee that any mortgage loans would be originated by Woodside or retained by the Credit Union for its own loan portfolio. *See, e.g.,*

*Kennedy v. Conrad*, 5th Dist. Tuscarawas No. 2003AP060046, 2004-Ohio-377, ¶ 13-18 (statute of frauds did not apply where, although appellant had cared for cattle on decedent's farm for six years, these services were contingent upon there being cattle on the farm and decedent's ownership the farm because "any agreement proven would have been for an indefinite period of time or could have been completed within less than a year").

{¶ 30} The Credit Union also contends that any agreement to transfer the servicing rights associated with the Credit Union loans Woodside originated to Woodside was unenforceable because paragraph F of the letter agreement requires that amendments to the letter agreement "be in writing, and dated and signed by both parties." However, there has been no showing that the parties intended their mortgage loan servicing agreement to be an "amendment" to the letter agreement. Paragraph G of the letter agreement expressly contemplates that the parties would enter into a "separate" mortgage loan servicing agreement. Further, even if the alleged mortgage loan servicing agreement was an "amendment" to the letter agreement, this would not preclude enforcement of the agreement, given that the parties allegedly performed under the "amendment" for more than eight years. *See, e.g., RotoSolutions, Inc. v. Crane Plastics Siding, L.L.C.*, 10th Dist. Franklin Nos. 13AP-1 and 13AP-52, 2013-Ohio-4343, ¶ 19 ("'[A]n oral modification of a written contract can be enforceable notwithstanding a provision in the contract requiring modifications to be in writing where * * * the parties have engaged in a course of conduct in conformance with the oral modification and where the party seeking to

enforce the oral modification would suffer injury if the modification were deemed invalid.'"), quoting *Exact Software N. Am., Inc. v. Infocon Sys., Inc.*, N.D. Ohio No. 3:03CV7183, 2004 U.S. Dist. LEXIS 7580 (Apr. 16, 2004). "Even contracts that are required by the statute of frauds to be in writing can be modified orally '"when the parties to the written agreement act upon the terms of the oral agreement."'" *Third Fed. S. & L. Assn. of Cleveland v. Formanik*, 2016-Ohio-7478, 64 N.E.3d 1034, ¶ 36 (8th Dist.), quoting *Third Fed. S. & L. Assn. of Cleveland v. Formanik*, 8th Dist. Cuyahoga Nos. 100562 and 100810, 2014-Ohio-3234, ¶ 13, quoting *200 W. Apts. v. Foreman*, 8th Dist. Cuyahoga No. 66107, 1994 Ohio App. LEXIS 4081 (Sept. 15, 1994).

{¶ 31} And finally, as it pertains to the first assignment of error, summary judgment in favor of Woodside on the declaratory judgment action was not in error. Neither party claimed the existence of, much less demonstrated, a material fact in dispute. Both parties, to the contrary, claim that judgment should be rendered in their respective favor based on the undisputed evidence. The Credit Union claims that because it never signed the May 2008 term sheet, it is relieved of the burden of adhering to all of its terms when only the fee structure was agreed upon. Woodside claims that the Credit Union's decision to operate under terms of the May 2008 term sheet for the better part of a decade manifested its agreement to the entirety of the unsigned document, which as a matter of law may be enforced. The trial court agreed with Woodside and enforced the terms of the unsigned document. "Questions regarding the existence of a contract and its meaning are questions of

law subject to de novo review on appeal." *Mulvey v. GuideOne Mut. Ins. Co.*, 2017-Ohio-7902, 98 N.E.3d 926, ¶ 15 (10th Dist.), citing *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9. There is no factual dispute precluding summary judgment.

{¶ 32} Thus, the sole issue upon summary judgment is whether an enforceable agreement exists between the Credit Union and Woodside despite the lack of the Credit Union's signature on the agreement that set forth the terms of the loan servicing arrangement under which the parties operated. The trial court concluded that by operating under the terms of the May 2008 term sheet, the Credit Union bound itself to the terms therein. This conclusion is not contrary to general contract principles. *Bank of Oklahoma, N.A. v. Woodland Meadows Partners, L.L.C.*, 10th Dist. Franklin No. 10AP-1199, 2011-Ohio-5058, ¶ 24, citing *Benefits Evolution, L.L.C. v. Atlantic Tool & Die Co.*, 9th Dist. Summit No. 25405, 2011-Ohio-4062, ¶ 26; *Hocking Valley Community Hosp. v. Community Health Plan of Ohio*, 4th Dist. Hocking No. 02CA28, 2003-Ohio-4243, ¶ 16.

{¶ 33} Instead, the Credit Union argues that the terms of the Origination Agreement dictated the loan servicing compensation under which the parties operated. The Credit Union did not identify which portion of the Origination Agreement set forth the fee schedule for loan servicing services Woodside provided before the May 2008 term sheet was exchanged. In fact, the Credit Union was unable to explain what agreement formed the basis of the fee schedule under which the parties operated if the May 2008 term sheet was not binding. The compensation

for the loan servicing services Woodside provided was articulated in the 2012 Loan Service Agreement and the May 2008 term sheet. Both documents contained the express statement that Woodside "shall own the servicing rights to any and all loans." Thus, at every point in their relationship, the Credit Union was on notice that Woodside tied the fee schedule to its ownership of the servicing rights for the life of the mortgage loan.

{¶ 34} According to the Credit Union, although the May 2008 term sheet dictated the monetary remuneration for the parties' agreement, the Credit Union did not intend to be bound by the exclusivity in ownership of the servicing rights. Given the particular facts of this case, we cannot cherry-pick which terms as expressed in the May 2008 term sheet the parties would be bound by after the fact. Had the Credit Union desired to operate under the fee structure as set forth in the May 2008 term sheet but not be bound by Woodside's ownership of the servicing rights, an objection or counteroffer was needed. It is undisputed that the Credit Union did not object to the declaration that Woodside would own the servicing rights during the period the parties operated under the fee structure as set forth in the unsigned agreement. In light of the undisputed evidence, the trial court did not err in granting judgment in favor of Woodside. The Credit Union bound itself to the terms as set forth in the May 2008 term sheet by operating under those provisions for almost a decade.

{¶ 35} In its second assignment of error, the Credit Union contends that the trial court erred in denying its motion for summary judgment on its claims for

breach of contract and conversion. The Credit Union's motion for summary judgment focuses on whether Woodside "owned" the right to service the mortgages at issue, and if not, whether Woodside wrongfully "converted" the Credit Union's "property" by failing to forward or return the information and data necessary to service the Credit Union's mortgage loan portfolio to the Credit Union upon the Credit Union's request. In light of our conclusion that the enforceable agreement between the parties included Woodside's ownership of the servicing rights for the life of the loan originated and maintained through the Credit Union, the Credit Union's second assignment of error is also overruled.

{¶ 36} We affirm.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., CONCURS;
EILEEN A. GALLAGHER, J., DISSENTS WITH SEPARATE OPINION

EILEEN A. GALLAGHER, J., DISSENTING:

{¶ 37} I respectfully dissent. Following a thorough, independent review of the record and construing the evidence in the light most favorable to the Credit Union, I believe a genuine issue of material fact exists as to whether there was a meeting of the minds that Woodside would "own" the servicing rights to the loans at issue, i.e., that Woodside would have the right to service the mortgage loans it originated for the Credit Union for the life of the loans. Accordingly, I would reverse the trial court's decision granting summary judgment in favor of Woodside on its counterclaim for declaratory judgment.

{¶ 38} A party who seeks to enforce an agreement has the burden of proving both the existence and *the terms* of the agreement. *Turoczy Bonding Co. v. Mitchell*, 8th Dist. Cuyahoga No. 106494, 2018-Ohio-3173, ¶ 19, citing *Nilavar v. Osborn*, 127 Ohio App.3d 1, 11, 711 N.E.2d 726 (2d Dist.1998). For an agreement to be enforceable, the essential terms of the agreement must be "'reasonably certain and clear'" and mutually understood by the parties. *Kostelnik*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, at ¶ 16-17, quoting *Rulli,* 79 Ohio St.3d at 376, 683 N.E.2d 337. In other words, there must be a meeting of the minds as to the essential terms of the agreement. Whether a meeting of the minds has occurred is a question of fact to be determined from all the relevant facts and circumstances. *See, e.g., Gutbrod v. Schuler*, 8th Dist. Cuyahoga No. 94228, 2010-Ohio-3731, ¶ 17; *see also Costner Consulting Co. v. U.S. Bancorp*, 195 Ohio App.3d 477, 2011-Ohio-3822, 960 N.E.2d 1005, ¶ 15 (10th Dist.).

{¶ 39} Based on the Civ.R. 56(C) evidence in the record in this case, there is a dispute as to when Woodside began servicing mortgage loans for the Credit Union and what precipitated Keller's forwarding of the May 2008 term sheet to Corrigan. Corrigan testified that Woodside began servicing loans for the Credit Union in 2007.[2] Corrigan testified that, at that time, Woodside looked at the "existing model" the Credit Union had with its previous loan servicer and the parties agreed that the Credit Union would pay Woodside for loan servicing at "more or less on the same scale as that one." Corrigan denied that the Credit Union ever agreed that Woodside would "own" the right to service the mortgages in perpetuity.

---

[2] The majority rejects Corrigan's testimony regarding when Woodside began servicing loans for the Credit Union — describing Corrigan's testimony as a "self-serving 'belief'" that "is not sufficient to create a genuine issue of material fact" — in favor of Keller's testimony regarding when Woodside began servicing loans for the Credit Union — describing Keller's testimony as "unambiguous." However, Corrigan's testimony that Woodside began servicing loans for the Credit Union in 2007 is no less "unambiguous" than Keller's testimony that Woodside began servicing loans for the Credit Union after the exchange of the May 2008 term sheet. Corrigan testified unequivocally that Woodside had been servicing loans for the Credit Union since 2007:

> Q. There's no question in your mind, though, that Woodside has been servicing loans since 2007?
>
> A. Yes.
>
> Q. Did they start servicing the loans at the inception of the agreement or did it come sometime thereafter?
>
> A. I believe they did it right out of the gate at the inception, correct.

Although presumably loan servicing documents exist that would show exactly when Woodside began servicing loans for the Credit Union, neither party submitted any such documents as part of its evidence on summary judgment.

{¶ 40} Keller testified that at the time the parties executed the letter agreement in September 2007, the Credit Union had "turned off the faucet on funding any loans." He testified that it was sometime in 2008 that Corrigan informed Keller that the Credit Union had "turned the faucet back on for mortgages" and asked if Woodside was set up to service loans for the Credit Union. Keller testified that, after he advised Corrigan that Woodside was able to service loans for the Credit Union, Corrigan forwarded two of the Credit Union's existing service contracts to Keller and said, "[I]f you can just put something together that reflects the terms of these agreements and get it over to me, we'll take a look at it." Keller testified that the proposed May 2008 term sheet he forwarded to Corrigan was his response to this request.[3]

{¶ 41} Woodside contends that the parties agreed that Woodside would service the loans in the Credit Union's mortgage loan portfolio consistent with the terms set forth in the May 2008 term sheet — including that "[Woodside] shall own the servicing rights to any and all loans" — and that Credit Union demonstrated its assent to those terms (1) through Corrigan's alleged statement to Keller that they were "good to go" after Keller forwarded the proposed term sheet to Corrigan in May 2008 and (2) by compensating Woodside for its services as provided for in the May 2008 term sheet for more than eight years. The Credit Union, in turn, contends that the "only understanding 'assented to'" was a "servicing fee schedule in place before

---

[3] There is no evidence in the record as to whether the Credit Union's agreements with any of its prior loan servicers provided that the loan servicer would "own" the servicing rights of the loans serviced.

the [May 2008 term sheet]," i.e., that the parties reached an oral loan servicing agreement in 2007 that did not include Woodside's "ownership" of the loan servicing rights as one of its terms, and that the May 2008 term sheet was simply an attempt by Woodside to "slip in" an additional term, not agreed to by the parties, after the fact.

{¶ 42} Contrary to the majority's assertion, this is not a matter of "cherry-pick[ing] which terms * * * the parties would be bound by after the fact." Rather, this is a matter of holding Woodside to its burden of proof to establish that Woodside's ownership of the loan servicing rights was, in fact, a term of the parties' agreement. As stated above, a party who seeks to enforce an agreement has the burden of proving both the existence and terms of the agreement. Although the majority concludes that "[t]he Credit Union bound itself to the terms as set forth in the May 2008 term sheet by operating under those provisions for almost a decade," the evidence shows only that the Credit Union paid, and that Woodside accepted, the fees listed in the compensation schedule in the May 2008 term sheet — the same fees the Credit Union contends the parties agreed to in 2007. Simply because there was a meeting of the minds as to the amount of fees Woodside was to receive (and, in fact, received) for servicing the loans at issue does not mean that there was also a meeting of the minds as to ownership of the right to service those loans.

{¶ 43} Whether the parties reached an oral loan servicing agreement in 2007 that did not include Woodside's "ownership" of the loan servicing rights as one of its terms, as the Credit Union contends, or whether the parties reached a loan servicing

agreement in May 2008 as set forth in the May 2008 term sheet that included such a term, as Woodside contends, the parties do not dispute that the fees the Credit Union paid Woodside for servicing the loans were the fees the parties had agreed the Credit Union would pay Woodside. There is no evidence in the record — separate and apart from the May 2008 term sheet itself[4] — that shows that the parties had also been operating under the provision of the May 2008 term sheet relating to the ownership of the loan servicing rights "for almost a decade." Accordingly, I believe a genuine issue of material fact exists for trial as to whether the parties agreed that Woodside would "own" the servicing rights for the mortgage loans Woodside originated for the Credit Union.

{¶ 44} "'"[T]he purpose of summary judgment is not to try issues of fact, but rather to determine whether triable issues of fact exist."'" *Gutbrod*, 8th Dist. Cuyahoga No. 94228, 2010-Ohio-3731, at ¶ 7, quoting *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.*, 87 Ohio App.3d 613, 619, 622 N.E.2d 1093 (8th Dist.1993), quoting *Viock v. Stowe-Woodward Co.*, 13 Ohio App.3d 7, 15, 467 N.E.2d 1378 (6th Dist.1983). Because I believe a genuine issue of material fact exists as to whether the parties agreed that Woodside would "own" the servicing rights for the mortgage loans Woodside originated for the Credit Union, I would find

---

[4] The majority asserts that both the May 2008 term sheet and the "2012 Loan Service Agreement" "contained the express statement that Woodside 'shall own the servicing rights to any and all loans'"; however, there was no "2012 Loan Service Agreement." Although Keller sent Corrigan a draft "Mortgage Loan Origination and Servicing Agreement" in 2012, i.e., a proposed written loan servicing agreement, it is undisputed that (1) it was never signed and (2) Woodside and the Credit Union never even discussed the draft agreement.

that the trial court erred in granting Woodside's motion for summary judgment and in declaring, as a matter of law, that Woodside "shall maintain the right to service all loans originating from [the Credit Union] through [April 4, 2018]." *See, e.g., Gutbrod* at ¶ 17-19 (trial court erred in granting summary judgment where issues of fact remained with respect to whether a meeting of the minds occurred regarding the terms of business venture, formation of company and nature of appellant's investment); *see also Costner*, 195 Ohio App.3d 477, 2011-Ohio-3822, 960 N.E.2d 1005, at ¶ 15-29 (evidence of parties' performance created questions of fact regarding whether parties mutually assented to terms of vendor agreement; "trial court impermissibly weighed the evidence in order to determine that factual question on summary judgment"). Accordingly, I would sustain the Credit Union's first assignment of error and reverse the trial court's ruling granting Woodside's motion for summary judgment on Woodside's counterclaim for declaratory judgment.